```
1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
2    ------------------------------------x
     UNITED STATES OF AMERICA,
3
                           Plaintiff,        Docket No.:
4                                            17 CR 434 (ARR)
             versus
5
     JOSE MIGUEL MELENDEZ-ROJAS, et al.,     U.S. Courthouse
6                                            225 Cadman Plaza East
                           Defendant.        Brooklyn, NY 11201
7    ------------------------------------x
                                             March 9, 2020
8                                            9:30 a.m.

9              Transcript of Criminal Cause for Trial

10   Before:   HONORABLE ALLYNE R. ROSS,
                               District Court Senior Judge
11             (and a jury.)

12                       APPEARANCES

13   For the Government:        RICHARD P. DONOGHUE, ESQ.
                                United States Attorney
14                              Eastern District of New York
                                271 Cadman Plaza East
15                              Brooklyn, New York 11201
                                BY:  ERIN ARGO, ESQ.,
16                                   TANYA HAJJAR, ESQ.,
                                     GILLIAN KASSNER, ESQ.,
17                                   Assistant U.S. Attorneys

18   For J.M. Melendez-Rojas:   SUSAN KELLMAN, ESQ.

19   For J.O. Melendez-Rojas:   MITCHELL GOLUB, ESQ.

20   For R. Melendez-Rojas:     THOMAS DUNN, ESQ.

21   For F. Melendez-Perez:     MICHAEL GOLD, ESQ.

22   For A. Romero-Melendez:    MICHAEL O. HUESTON, ESQ.
                                JACQUELINE CISTARO, ESQ.
23
     Official Court Reporter:   MICHELE NARDONE, CSR
24                              Email:  Mishrpr@aol.com
     Proceedings recorded by mechanical stenography.  Transcript
25   produced by computer-aided transcription.
```

MICHELE NARDONE, CSR -- Official Court Reporter

Sidebar

1        (Defendants present in open court.)

2        (Through the interpreter.)

3        (Sidebar conference.)

4        MR. GOLD:  Basically, Your Honor, adding to the many

5   joys of this trial, over the weekend I was diagnosed with a

6   bacterial infection -- not contagious, not even remotely

7   serious -- and which would ordinarily be of no consequence

8   whatsoever; but the medication I take is ten times worse than

9   the infection, and basically I'm supposed to be off my feet,

10  don't lift anything, and stay indoors, which is conducive for

11  the middle of a trial, because apparently tendons are prone to

12  tear spontaneously.

13        THE COURT:  Just take your time.  Whatever you need.

14        MR. GOLD:  Well, that was my request.  I don't frankly

15  anticipate a problem, and other than Delia's cross and

16  summation, I don't really foresee being on my feet for any

17  great length of time.

18        THE COURT:  Right.

19        MR. GOLD:  I would hope that in the event I'm in the

20  middle --

21        THE COURT:  Any time you want a break, anything you

22  want, just say.

23        MR. GOLD:  I appreciate it.  And, similarly, if we can

24  just add in one more break, a five-minute break, in the morning

25  and afternoon?

MICHELE NARDONE, CSR -- Official Court Reporter

Sidebar

1        THE COURT:  Yes.  We will add in extra breaks.  You

2   just raise your hand or communicate somehow.

3        MR. GOLD:  I'm not going to interrupt anything and

4   it's not going to be in the middle of anything.

5        THE COURT:  I don't know if you want this done at

6   sidebar, but just a follow-up on the correspondence over the

7   weekend, eloquent, just as you have been orally, but my ruling

8   is the same.

9        MR. GOLD:  I understand.

10        MR. DUNN:  Your Honor, I want to bring something to

11   the court's attention.

12        On Saturday night on the ION station, there was a show

13   of Law and Order SUV, and it was on Tenancingo.  They showed

14   the town, they showed the house; and there were two incidents

15   that were rather disturbing.  There was a girl whose cat had

16   gotten out of the window.  She reached out, and one of the

17   pimps grabbed her.  And then there was one where a child was

18   walking with the mother by the hand, and they grabbed her; and,

19   apparently, they also showed Queens.

20        I didn't see it, but my wife saw it, and because I had

21   been talking about Tenancingo, she kind of woke up about it.

22        THE COURT:  What is the name of the station?

23        MR. DUNN:  It's called ION, I-O-N.  It's a cable

24   station, and they show a lot of Law and Order type of shows.

25        MR GOLUB:  SVU.

MICHELE NARDONE, CSR -- Official Court Reporter

Sidebar

1        MS. KELLMAN:  I spent the weekend trying to find it.

2        MR. DUNN:  I looked for it too, but there were

3    articles about it because it was a premier, it was the premier

4    of the 2015 season for that show.

5        THE COURT:  Okay.

6        MR. DUNN:  In addition to that, there was also

7    articles in The Post and The News about the case, just general

8    articles, but I was more concerned about -- you know, the odds

9    of them seeing this are probably very slim.

10        THE COURT:  I could ask whether or not anyone watched

11    the cable station ION on Saturday night.

12        MS. KELLMAN:  It would be available, I would venture

13    to guess, any time.  If it's on ION you can watch it any time.

14        THE COURT:  Okay.  So I will ask them if any of them

15    watched ION over the weekend; and, if they did, we will excuse

16    the other jurors and talk to them one by one.

17        MR GOLUB:  One last thing.  This is individual to my

18    client.  He advised me on Friday when I was talking to him

19    after the break in the proceedings that he works in the

20    bathrooms at the jail.  That's his job, and he picked up a

21    fungal infection on his job; and he asked them repeatedly for

22    medical treatment, and he has been declined.

23        I spoke to Dennis about it.  I called the jail on

24    Friday.  I spoke to the legal department, and they said, oh,

25    well, I will send an e-mail over to medical.  Hopefully they

Sidebar

1   will deal with it.  I spoke to the client, said did they see

2   you over the weekend; and he said no.  So it's not been

3   resolved.

4          THE COURT:  It's not resolved?

5          MR GOLUB:  No.

6          THE COURT:  Dennis, is this for me to sign?

7          THE CLERK:  I don't know the description of what is

8   needed to be done.

9          THE COURT:  So he has a fungal infection on his arm?

10         MR GOLUB:  On his arm.

11         THE COURT:  This is?

12         MR GOLUB:  Jose Osvaldo Melendez-Rojas.  There are two

13  Joses, but he is Jose Osvaldo.

14         THE CLERK:  Do you have his number?

15         MR GOLUB:  One second.  I will give it to you.

16         MS. KELLMAN:  The reality is, judge, they are not

17  going to see him because he gets to the jail when the medical

18  staff is already gone.

19         MR GOLUB:  His number is 83689 --

20         THE COURT:  You can call the staff.

21         MS. KELLMAN:  There is going to be nobody there.

22         THE CLERK:  I'm e-mailing that number.

23         THE COURT:  The number for him?

24         MR GOLUB:  83689-053.

25         THE COURT:  Okay.  Jose Osvaldo Melendez-Rojas?

MICHELE NARDONE, CSR -- Official Court Reporter

774

Sidebar

1          MR GOLUB:  Yes, that's correct.

2          THE COURT:  Has a fungal infection on his arm.  Okay.

3          One more thing.  We have lost another alternate.  She

4   called, Alternate number 1.  Apparently, her children are sick,

5   and they will not let them go to school.  So we are down to

6   three.

7          MR GOLUB:  Okay.

8          MS. HAJJAR:  Your Honor?

9          MS. KELLMAN:  Nobody has a fever, right?

10         (Pause.)

11         THE COURT:  I think we put it up on ECF, but we had a

12  problem with --

13         MS. KELLMAN:  Juror number 6.

14         THE COURT:  Yes, and we received consent from

15  everyone; and so the individual is not here.  So we now have

16  them moving up.  We will have three.

17         MS. HAJJAR:  Your Honor, just on the matter of losing

18  jurors and sort of timing of the case generally, I think our

19  estimate remains the same, that we hoped to rest this week,

20  Wednesday or Thursday.  Wednesday might be optimistic, so Erin

21  keeps reminding me of that.  Thursday most likely.

22         However, if there is going to be a defense case and a

23  rebuttal case, we have advised counsel that there may be

24  rebuttal government witnesses, at least one of whom we really

25  would need to sort of know about in advance.

MICHELE NARDONE, CSR -- Official Court Reporter

Sidebar

1          We have advised the jury, I think, that we thought

2    this case would be concluded in two weeks; and I just worry

3    that if there is going to be a lengthy case, defense case or

4    rebuttal case, we will be well into a third week.  I recall at

5    least one juror had a medical appointment that she rescheduled.

6          So I just wanted to put that -- I know counsel may

7    not know or they may not be able to advise the court right

8    now, but obviously the more we know in terms of the length of

9    trial.

10          THE COURT:  The quicker we get through this trial, the

11   more likely it will end and not end in a mistrial.

12          MS. KELLMAN:  Before we are all quarantined.

13          THE COURT:  Exactly.  So I just hope we can move as

14   fast as we can.  I know the government is trying; I know

15   defendants are trying.  But be very, very careful of

16   repetition.

17          MS. KELLMAN:  Just one additional thing, judge.  I

18   have a doctor's appointment a week from Wednesday, which

19   hopefully won't be a problem; but when I took this case I told

20   Dennis it was the one thing -- and it's 10:30 in the morning,

21   so we could always start late.

22          THE COURT:  We can start in the afternoon, if we had

23   to.

24          MS. KELLMAN:  Hopefully it won't be an issue.

25          THE COURT:  Okay.  Anything else?  Okay.

MICHELE NARDONE, CSR -- Official Court Reporter

USA v. Melendez

1          MS. KELLMAN:  We are good.

2          MR. GOLD:  Thank you.

3          (End of sidebar conference.)

4          (Continued on the next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MICHELE NARDONE, CSR -- Official Court Reporter

USA v. Melendez

1          (In open court.)

2          THE COURT:  I have one more question.  This relates to

3  the jury charge.  My question is:  Is count 14 in the case or

4  not in the case?  Originally count 14 was, I believe, Abel and

5  Francisco.

6          THE CLERK:  Abel and Rosalio.

7          THE COURT:  And then Abel dropped out.  Not Abel, I'm

8  sorry.

9          MS. ARGO:  Yes, Your Honor, count 14 is still part of

10  the indictment.  Rosalio is also charged in that count, and so

11  he is still charged with that count.

12          THE COURT:  Okay.  We will put it back into the

13  charge.

14          MS. ARGO:  Your Honor, I think one other thing before

15  the witness comes out.  I think that Your Honor had indicated

16  on Thursday that the court reporter as well as Your Honor was

17  having some trouble understanding the witness in English.

18          THE COURT:  Right.

19          MS. ARGO:  I didn't know how exactly, if you would

20  like me to just do that on direct and just explain to her that

21  the Spanish interpreters are here and it would be preferable

22  just to stick with Spanish so that the court reporter can

23  follow.

24          THE COURT:  I would appreciate it, because it's hard

25  going back and forth.

MICHELE NARDONE, CSR -- Official Court Reporter

USA v. Melendez

```
 1            MS. ARGO:  Okay.  I will do that.

 2            THE COURT:  Okay.

 3            MS. ARGO:  Thank you.

 4            THE CLERK:  All interpreters, stand and raise your

 5   right hand.

 6            (Interpreters sworn.)

 7            THE CLERK:  Please state your name for the record.

 8            THE INTERPRETER:  Maria Elena Alvarado.

 9            THE CLERK:  Thank you.

10            THE INTERPRETER:  Elizabeth Caruso.

11            THE CLERK:  Thank you.

12            THE INTERPRETER:  I do.  Nathan Rhodes, R-H-O-D-E-S.

13            THE INTERPRETER:  Jan Calloway.

14            THE CLERK:  Thank you.

15            MS. ARGO:  Your Honor, shall I bring in the witness

16   now?

17            (Pause.)

18            (Delia resumes the witness stand.)

19            MS. ARGO:  I was just explaining I was making an

20   instruction in front of the jury, so the jury understands as

21   well, if that's all right with everyone.

22            THE COURT:  All right.  That's fine.

23            THE CLERK:  All rise.

24            (Jury enters.)

25            THE COURT:  Please be seated.  As you can see, we do
```

MICHELE NARDONE, CSR -- Official Court Reporter

Delia - Direct/Argo

1    not have Juror number 2 with us.  So I'm going to ask the

2    person who is now Alternate number 1 to come forward and be

3    Juror number 2, and the three of you just move down.  You are

4    now Alternates 1, 2, and 3.  Thank you.

5              THE CLERK:  I just want to remind you, you are still

6    under oath.

7              THE WITNESS:  Okay.

8              THE CLERK:  Thank you.

9              MS. ARGO:  Your Honor, may I inquire?

10             THE COURT:  Yes, please.

11             MS. ARGO:  Thank you.

12   DELIA, called as a witness, having been previously

13        duly sworn/affirmed, was examined and continued

14        to testify as follows:

15   DIRECT EXAMINATION

16   BY MS. ARGO:

17   Q    (Through the interpreter) Good morning, Delia.

18   A    Good morning.

19   Q    So, Delia, the last time we were here in this courtroom

20   you were testifying in English.

21             That was on Thursday, right?

22   A    That's correct.

23   Q    But we were informed that the court reporter was having

24   trouble keeping up with the occasional need to speak with the

25   interpreter and swapping between English and Spanish.

MICHELE NARDONE, CSR -- Official Court Reporter

Delia – Direct/Argo

1      So for today's testimony, is it all right for you to

2    testify in Spanish?

3    A    Yes.

4    Q    Okay.  Delia, when we last spoke on Thursday you testified

5    that Rosalio and Fabiola told you to keep the condoms for your

6    shift tucked inside your bra?

7    A    That's correct.  Both of them gave me instructions.

8    Q    Where were the condoms kept in the apartment that you

9    lived in?

10   A    Francisco kept the condoms in the closet of the room he

11   was keeping me in.

12   Q    What happened if you ran out of condoms in the apartment?

13   A    Rosalio or Francisco would buy more condoms.  They would

14   call a person.

15   Q    Do you recall the name of the person that they called?

16   A    They just talked about chocolates.  I don't remember the

17   name.

18   Q    You said chocolates.

19        What do you mean by that?

20   A    Francisco and Rosalio referred to condoms as chocolates

21   that's what they called them.

22   Q    Do you have any idea of why they would call them

23   chocolates?

24   A    I don't remember why they called them chocolates.

25   Q    Aside from the condoms, what else was kept in this closet,

MICHELE NARDONE, CSR –– Official Court Reporter

Delia - Direct/Argo

1   if you know?

2   A    They kept money, like inside the inside pocket of a coat,

3   and they also had lubricant there.

4   Q    What other instructions, if any, did you get from Rosalio

5   if you encountered the police?

6   A    Rosalio told me that if police arrested me I should give

7   my name but I should give a different birth date.  I should not

8   take the agents to the place where I live.  They would figure

9   out themselves how to get me out.

10          Rosalio also told me that if the agents were to ask me

11  why I was working in prostitution, I should tell the agents

12  that I was doing this because my parents were sick.

13  Q    You mentioned that Rosalio told you to give a different

14  date of birth.

15          Why is that, if you know?

16  A    That's correct.  It was because I was a minor.  I hadn't

17  even turned 18, and they did not want me to appear as a child

18  to authorities.

19  Q    Were there any other instructions that Rosalio or

20  Francisco gave you with respect to your age?

21  A    Yes.  They told me never to tell my age to anybody and to

22  always say I was 18.

23  Q    What, if anything, were you instructed to wear as a

24  prostitute?

25  A    I had to use short shorts and very tight clothing, lots of

MICHELE NARDONE, CSR -- Official Court Reporter

Delia – Direct/Argo

1    makeup.  Sometimes I had to wear short dresses and heels, and

2    sometimes shoes with no heel.  And I had to use blouses that

3    would show my breasts.

4    Q    You said you "had to use."

5         Was there anyone that was instructing you to wear

6    these items of clothing?

7    A    Yes.  Francisco told me that I had to use those clothes,

8    and it was the only type of clothing that Francisco had bought

9    me.

10   Q    What, if anything, were you instructed with regards to

11   your hair?

12   A    Yes.  Since I had short hair, they said I shouldn't be

13   cutting it, I should let it grow long, because the clients

14   would like it like that; and Francisco liked women with long

15   hair.

16   Q    Did you ever receive any instructions about the color of

17   your hair?

18   A    Yes.  When I had recently arrived in New York, Rosalio

19   died my hair with highlights so that I would appear more adult

20   because I was only 14 years old and I looked like a child.  So

21   he said I had to appear more adult with this hair color.

22   Q    Did any other issues come up while you were working as a

23   prostitute, regarding your age?

24   A    Can you repeat that?

25   Q    Sure.  Were there any other issues that came up with

MICHELE NARDONE, CSR –– Official Court Reporter

Delia – Direct/Argo

1   regards to you working as a prostitute and your age or your

2   appearance?

3   A    There were times that drivers did not want to give me work

4   because I was too young.  They were afraid that the police

5   would arrest them for that reason.

6   Q    When you were working as a prostitute did you use your

7   real name?

8   A    No.  I used the name Katherine.

9   Q    Why did you choose that name?

10  A    I chose that name because a friend of mine had a friend

11  who had died, and her name was Katherine.  So it occurred to me

12  that that would be a good name for me because nobody knew her.

13  Q    After you received these instructions from Rosalio and

14  Francisco, when were you first forced to work as a prostitute?

15  A    Can you repeat that once again, please?

16  Q    Sure.  After you received these instructions from Rosalio

17  and Francisco, when were you first forced to work as a

18  prostitute?

19  A    Yes.  I was first forced to work on October 28.  It was in

20  Long Island.  I remember this -- oh, I'm sorry, not Long

21  Island.  Staten Island.

22       It was in Staten Island, and I remember because the

23  client broke the condom; and I called Francisco, and Francisco

24  passed the telephone over to Rosalio, and Rosalio gave me some

25  instructions.

MICHELE NARDONE, CSR -- Official Court Reporter

784

Delia – Direct/Argo

1   Q    Let's take that step by step, if we could.

2        So you said your first shift was on Staten Island; is

3   that correct?

4   A    That's correct.

5   Q    How did you get to Staten Island?

6   A    That day Guadalupe, I don't know if -- I don't remember if

7   she contacted Rosalio or Francisco.  Rosalio gave me a phone

8   number to work.

9        THE INTERPRETER:  Oh, I'm sorry.  A phone, an actual

10  phone, not a phone number; the interpreter correction.

11  A    Rosalio gave me the phone number for the driver.  Pinocho

12  was his name.  He came by to pick me up.  That day Rosalio's

13  sister was also in the car.

14  Q    So you and Guadalupe were in the car.

15       What happened next?

16  A    The driver was there.  He picked me up.  There were

17  other -- he had other girls.  We arrived in Staten Island, and

18  when we arrived there other drivers came to meet up with us;

19  and each driver took one of the girls with them.

20  Q    What about you, where did you end up?

21  A    I ended up working with Pinocho that first night.

22  Q    Where did Guadalupe go, if anywhere, at that point?

23  A    She left with a different driver.

24  Q    So at this point you were alone in the car with Pinocho?

25  A    That's correct.

MICHELE NARDONE, CSR -- Official Court Reporter

785

Delia - Direct/Argo

1   Q   How did you feel in that moment?

2   A   I was nervous.  I was scared.  It's the first time that I

3   did this.

4   Q   So you had testified previously that you went to service

5   your first client.

6       Can you walk us through what happened?

7   A   The first client asked me to go into every position that I

8   had to do, and in one of those positions he broke the condom.

9   I didn't realize it.  I was new.

10      Once the 15 minutes were over and he had ejaculated

11  inside of me, I was able to see that the condom was broken.  I

12  got scared.  I didn't know what to do.  So the first thing I

13  thought of was calling Francisco.

14  Q   Where did you call Francisco from?  Where were you located

15  at that point?

16  A   At that time I was in the room of this person, the client.

17  That's where I called Francisco from.

18  Q   What happened next?

19  A   Francisco told me that he was going to hand the phone over

20  to his uncle, Rosalio, and that he was going to give me some

21  instructions that I had to follow very precisely before I got

22  back home.

23  Q   What did Rosalio tell you to do?

24  A   Rosalio told me that I should go to the bathroom and that

25  I should use some water and my fingers, put my fingers inside

MICHELE NARDONE, CSR -- Official Court Reporter

Delia – Direct/Argo

1   my vagina to wash up, and that later on he would have something

2   ready for me to help.

3   Q    What happened after that?

4   A    Well, after that I was in a lot of pain because it was the

5   first time I had been working like this, and Rosalio -- well, I

6   was very irritated.  Rosalio had some aloe vera, which was

7   frozen, and he also had something, a kind of tea, which he said

8   I should use as a douche.

9          And after that -- and then Francisco put some aloe

10  vera around my vagina.  It burned.  It was so cold.  It felt

11  horrible.  It smelled awful.

12  Q    I just want to back up for one minute.

13  A    Okay.

14  Q    You testified earlier that with this first client the

15  condom broke.

16         What happened after that first client?

17  A    After that I had to continue working that night.  I

18  couldn't go back.

19  Q    How many clients did you see after that incident, that

20  shift?

21  A    Approximately 20.  I don't really remember.

22  Q    After that first shift what, if anything, did Francisco

23  say to you?

24  A    Well, Francisco said everything would be okay.  I had to

25  continue working, he had debts, he had to pay his family back

MICHELE NARDONE, CSR -- Official Court Reporter

787

Delia – Direct/Argo

1   their money; and I was scared because of what had happened the

2   day before.  Francisco said, well, you have to keep working

3   and, if not, he said he was going to kill my family.  I was

4   scared.

5   Q    When was the next time you were forced to work as a

6   prostitute?

7   A    The next day.

8   Q    What hours did you typically work?

9   A    From approximately 9:00 in the morning until 7:00, and

10  then 7:30 until 3:00 or 4:00 in the morning.

11  Q    How many days a week did you work?

12  A    I had to work seven days a week.

13  Q    How many clients per shift did you see?

14  A    It would depend.  Sometimes I would have 30, 40, 50.

15  Q    What would happen if you had less than that and you came

16  home to Francisco?

17  A    Francisco would get mad.  He would tell me I would have to

18  work more.  And then also, if one particular driver didn't have

19  enough clients, another one had to be called so I could make

20  more money on the days that I hadn't produced the amount that

21  he was expecting.

22  Q    Where were you forced to work in prostitution?

23  A    I was forced to work near Queens, Brooklyn, Long Island,

24  Staten Island, Delaware, Philadelphia, Connecticut.  Those

25  places.  Also New Jersey.

MICHELE NARDONE, CSR –– Official Court Reporter

Delia - Direct/Argo

1    Q    Who would take you to these places?

2    A    The person who would take me were the drivers; and, if

3    not, for example, times when I would have to go to

4    Philadelphia, there was a car that would come to pick me up.

5    It was a company, Gerardo's.  They would pick me up at my

6    address.

7    Q    With respect to the other places that you went, how did

8    that work with these drivers?  Can you explain that to the

9    jury?

10   A    Well, yes.  I would call that Gerardo's company to come

11   and pick me up.  Once I was told the destination where I was

12   going, and if it was Philadelphia, I would have to call the

13   driver, say I was going to Philadelphia and have to confirm

14   with the driver that there was in fact work for me that week.

15        So then the person who was going to drive me from the

16   Gerardo's company, I would give that person the address of

17   where I was going, my destination; and then the driver of the

18   Philadelphia destination would take me to his house.

19   Q    To a house, can you explain what you mean by that?

20   A    Yes.  Well, the times I would go to Philly,

21   Philadelphia -- excuse me, interpreter correction -- the driver

22   would pick me up, take me to his house.  I would leave my

23   suitcase there.

24        Then he would take me to the addresses belonging to

25   the clients who had called.  It was like ordering food for

MICHELE NARDONE, CSR -- Official Court Reporter

Delia – Direct/Argo

1    delivery at home.  That's how I did that.

2         I was also taken -- well, the same thing would happen

3    when I would go to Delaware, but it was a little different

4    there.

5    Q    Can you explain how it was different?

6    A    Of course.  Well, it was different because what would

7    happen there, I would be taken to a trailer.  It was a small

8    place.  There were lots of holes, it was very cold.  And what

9    would happen there was I wouldn't be taken to the clients'

10   addresses; they would come there.

11        There were two people there who were responsible for

12   keeping an eye on things, to make sure everything was okay.

13   They were two men.

14   Q    Delia, you testified on Thursday about a notebook that

15   Rosalio gave you with drivers' phone numbers in them.

16        Can you explain that to the jury?

17   A    Of course I can.  So the phone numbers, the phone numbers

18   were in the notebook.  Rosalio had given me it, and there were

19   the drivers' names and phone numbers; and I had to use that to

20   contact them.

21   Q    How long would you typically work with a driver?

22   A    Only a week, and then the following week I had to work

23   with a different driver.

24   Q    Would you ever set a schedule for yourself week by week?

25   A    Yes.

MICHELE NARDONE, CSR -- Official Court Reporter

790

Delia – Direct/Argo

1    Q    Would you ever write that down anywhere?

2    A    Yes, I did write it down.

3    Q    Would you occasionally write that down in the notebook?

4    A    Yes.

5    Q    Did anyone ever try to figure out or calculate how much

6    money you earned per shift?

7    A    Yes.  Francisco was the one who calculated how much I made

8    per shift.

9    Q    Would he ever write that down anywhere, if you know?

10   A    Yes.  He would write that down in a notebook.

11   Q    You mentioned the notebook that Rosalio gave you.

12        Were there other such notebooks in the apartment where

13   you lived?

14   A    Yes, there were more notebooks.

15        MS. ARGO:  I'm going to show just to the witness

16   what's been marked as Government's Exhibit 201.

17   Q    Do you recognize this?

18   A    Yes.

19   Q    What do you recognize it to be?

20   A    It's a notebook where I would have information like

21   drivers' phone numbers, some notes.

22        MS. ARGO:  At this time the government moves

23   Government Exhibit 201 into evidence.

24        MR. GOLD:  No objection.

25        THE COURT:  Admitted.

MICHELE NARDONE, CSR –– Official Court Reporter

Delia – Direct/Argo

1    (Government Exhibit 201 so marked.)

2    MS. ARGO:  May I publish this to the jury?

3    THE COURT:  Yes.

4    MS. ARGO:  Thank you.

5    (Published.)

6    BY MS. ARGO:

7    Q    Delia, I'm going to flip through some pages and talk to

8    you about those.

9    THE COURT:  The jury hasn't quite gotten it.

10   MS. ARGO:  I will give the jury a minute.

11   A    Okay.  That's fine.

12   THE COURT:  Is everybody ready?  Okay.  That's fine.

13   MS. ARGO:  Thank you.

14   Q    Delia, I'm showing you a page that's been tabbed here.

15   Do you see this page?

16   A    Yes, I see it.

17   Q    Can you just walk the jury through what's on this page.

18   A    Of course I can, yes.

19   So on this first page, what's written here is Alex,

20   111th, April 22.  Alex was the person who would drive me.  He

21   would take me as a delivery person.  Alex at the time lived at

22   the 111th address.

23   The next one says Alejandro, 90-32.  He was also a

24   driver.  I worked with him in Queens.  I don't remember where

25   he lived.

MICHELE NARDONE, CSR –– Official Court Reporter

Delia – Direct/Argo

1   Q    I think we might have just skipped a line.

2        Do you see this line here (indicating)?

3   A    Well, yes.  Apparently it says here that I worked with

4   Alejandro on July 15.

5   Q    There a line right above that, and I believe the name

6   might be Jairo.

7        Do you recognize that?

8   A    Yes.  Jairo, I worked with him on Long Island on June 24.

9   Q    Just moving down, you just mentioned Alejandro line, which

10  is the third line down.

11       If we can go to the fourth line, what does that say?

12  A    It says June 3, Alejandro.  So I apparently worked with

13  Alejandro on June 3.

14  Q    What about the next line under that?

15  A    The next line says that I worked on June 17 with Alejandro

16  at night.  The next line says 7 Mateo D.  I don't know.  I

17  don't remember.

18       THE INTERPRETER:  Can the interpreter just correct.

19  It's Mateo DE.

20  Q    Let me start over here on this page.

21       What does this page say?

22  A    The next line says Don Max, bone doctor.  I went to see

23  him once because my body hurt all over.  So I went to this

24  address -- well, I went to see this man.

25  Q    Why did your body hurt all over?

MICHELE NARDONE, CSR -- Official Court Reporter

Delia - Direct/Argo

1   A    Because on two different occasions some clients pushed me

2   down the stairs from the second floor, and I fell down with a

3   leg on top and a leg on the bottom.  So I had a lot of pain in

4   my hips.

5   Q    We will talk about those instances in a little while.

6   Let's go back to the notebook.  Move the page over here so we

7   can see it.

8        Delia, what's listed on this page, if you know?

9   A    This page, there is the names of drivers and in different

10  places that I contacted.

11  Q    The notation that's next to them, there seems to be

12  numbers; and then what's next to the numbers?

13  A    The numbers are there, and to the right there are the

14  names of the drivers, the names I knew them by.

15  Q    What else is listed there, past the driver names?

16  A    It had -- it has the name of the place where they worked,

17  for example, Manhattan, Brooklyn, White Plains, Queens.

18  Q    Turning the page to the next page over, do you see that

19  all right?

20  A    Yes.

21  Q    What about this page, can you explain that to the jury?

22  A    Of course.  In the first row there is Alex.  He lived at

23  an address on 111th, different from another Alex that's on the

24  list.  There is Armando, there is Beto; and as to pueblitos, I

25  used to work with him in Long Island sometimes.  He was known

MICHELE NARDONE, CSR -- Official Court Reporter

Delia - Direct/Argo

1    for working outside of the city.

2    Q    Is that what you are referring to with the notation

3    pueblitos?

4    A    Of course.  In places like in Long Island they would be --

5    you would be in a lot of different places.  He would be in

6    Westbury at one moment and then a different place right after;

7    and this is why they called them -- why I called them

8    pueblitos, little towns.

9    Q    Let's move the page up a little bit.

10        Anything else you notice, any other locations?

11   A    Yes.  There is an address in Connecticut, New York.  Those

12   are some of the places.

13   Q    I'm going to show you what's been marked just for the

14   witness now.  It's been marked as Government Exhibit 202.

15        Do you recognize this?

16   A    Yes, I do recognize it.

17   Q    What do you recognize it to be?

18   A    It's a notebook that has some notes in it, some notes that

19   Francisco wrote to me, and some dates in which I worked.

20        MS. ARGO:  At this time the government moves

21   Government Exhibit 202 into evidence.

22        MR. GOLD:  No objection.

23        THE COURT:  Admitted.

24        (Government Exhibit 202 so marked.)

25        MS. ARGO:  If we can publish that to the jury, please.

MICHELE NARDONE, CSR -- Official Court Reporter

Delia – Direct/Argo

1      (Published.)

2   BY MS. ARGO:

3   Q   Delia, can you see that okay?

4   A   Yes.

5   Q   Okay.  Let me turn to the pages here –– I will turn to

6   this page first.

7          Down here at the bottom, what does this say?

8   A   It says that Thursday from 10:00 to 4:00, it seems like.

9   Then again from 10:00 to 8:00.  Then it says 26.  Then Friday,

10  10:00 to 4:00, plus 9.  10:00 at 8:00, 11:00 to 9:00, and then

11  it says at the bottom Saturday at 10:00.

12  Q   Delia, do you have any understanding as to what this is?

13  A   It was the clients that I had.

14  Q   Are these also times listed here?

15  A   Yes.

16  Q   As well as days?

17  A   Yes.  That's what's on there.

18  Q   Turn to another page.

19         Delia, what's on this page, if you know?

20  A   It's about money.  Francisco made some notes there.  They

21  would also do tandas, a savings club.

22  Q   Can you explain how that worked?

23  A   Of course.  It was, for example, Francisco plus six or

24  seven people, and let's say that this month they put in a

25  thousand dollars each.  So then the first person would get

MICHELE NARDONE, CSR –– Official Court Reporter

Delia – Direct/Argo

1   $6,000, and then they would all put in a thousand dollars each

2   week to pay off the $6,000.

3   Q    You said they participate in this tanda.

4        Who is they?

5   A    It was Francisco, Rosalio, Miguel, Osvaldo, Abel, among

6   others.

7   Q    Where did the money come from that was in this tanda, if

8   you know?

9   A    All of that money came from what I produced and what

10  Rosalio, Osvaldo, Abel, and Miguel would make because they had

11  women working in prostitution for them.

12  Q    This comment down here at the bottom, what does that say?

13  A    It says Guacho loaned me 300, but on the dia –– on the

14  hundred he did not give me the 200.  I owe him a hundred.

15  Q    Delia, do you have any understanding of who Guacho is?

16  A    Yes.  Guacho is Rosalio.

17  Q    Turning to another page here, Delia, what does this page

18  say?

19  A    This page says Cristian and Delaware, which is the State

20  of Delaware, and the number.  I went to work with this person

21  there.

22  Q    Is this person a delivery driver?

23  A    No.  It's the person who has the trailer with all the

24  holes where it was really cold, and that's the one where the

25  clients would come directly.

MICHELE NARDONE, CSR –– Official Court Reporter

Delia – Direct/Argo

1   Q    I'm going to show you another page here.

2        Delia, what does that say, if you know?

3   A    That was -- it says Mojarra.  That was Francisco's

4   nickname.  He was known as Mojarra.

5   Q    Who drew this, if you know?

6   A    It was Francisco who drew it.

7        (Continued on the next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

798

Delia – Direct/Argo

1           (In open court.)

2   DIRECT EXAMINATION

3   BY MS. ARGO (continuing):

4   Q    Delia, can you tell us what's on this page, starting at

5   the top here.

6   A    Francisco also used to call himself Frankie.

7   Q    Is that's what's at the top of the page?

8   A    Yes.

9   Q    What about this next down here?

10  A    I don't remember right now what that means.

11  Q    What about the lines below that, what does that say?

12  A    What it says here is chikita, I'm going to chikitiar you.

13  And what that means, what Francisco was referring to is by the

14  word "chikitiar," I'm going to have anal sex with you.

15  Q    Did you want to have anal sex with Francisco?

16  A    No.  It was very painful and I didn't like it but he would

17  do it to me even if I didn't want to.

18  Q    Delia, I'm going to show you what's in evidence as

19  Government's Exhibit 33.  This can be published to the jury as

20  well, it's in evidence.

21          Delia, do you recognize this person in Government's

22  Exhibit 33?

23  A    Yes, I met him as Alex.  He's Alex from Ecuador and he's

24  one of the drivers.

25  Q    I'm going to show you what's in evidence as Government's

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

Delia - Direct/Argo

1    Exhibit 34 which also can be published to the jury.

2           Do you recognize this person?

3    A    Yes.  That he was one of the people who would be out in

4    the street calling out girls, girls, and giving out cards with

5    phone numbers and a picture of a girl in just like a bra and a

6    bikini.

7    Q    What were these cards for, if you know?

8    A    These cards were for clients so that they could call the

9    drivers so they could request a girl.

10   Q    I'm going to show you what's in evidence as Government's

11   Exhibit 35.

12          Do you recognize this person?

13   A    Yes, I do recognize him.

14   Q    Who do you recognize that to be?

15   A    I recognize him because he was one of the drivers and he

16   was known as Barbas.

17   Q    Did you say Barbas?

18   A    Yes, El Barba, because of his mustache.

19   Q    I'm going to show you what's in evidence as Government's

20   Exhibit 36 which also can be shown to the jury.

21          Do you recognize this person?

22   A    No.

23   Q    I'm going to show you what's in evidence as Government's

24   Exhibit 37.

25          Do you recognize this person?

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

Delia - Direct/Argo

1    A    Yes, I recognize him.  I know him as Armando.  He was also

2    one of the drivers.

3    Q    I'm going to show you what's in evidence as Government's

4    Exhibit 38.

5         Do you recognize this person?

6    A    No.

7    Q    I'm going to show you what's in evidence as Government's

8    Exhibit 39.

9         Do you recognize this person?

10   A    Yes, I recognize him.  He's one of the drivers, Alex, who

11   lived on 111th.

12   Q    I'm going to show you what's in evidence as Government's

13   Exhibit 40.  It can also be shown to the jury.

14        Do you recognize this person?

15   A    Yes, I do recognize him.  His name is Alex, he also lives

16   on 111th.

17   Q    I'm going to show you what's in evidence as Government's

18   Exhibit 41.  Do you recognize this person?

19   A    Yes, I do recognize him.  He was one of Barbas' drivers.

20   I knew him as Nigro.

21   Q    That was his nickname?

22   A    Yes.

23   Q    I'm going to show you what's in evidence as Government's

24   Exhibit 43.

25        Do you recognize this person?

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

Delia – Direct/Argo

1   A    Yes, I do recognize him.  He's one of the New Jersey

2   drivers.

3   Q    I'm now going to show you, and this is just to the

4   witness, what's been marked for identification as Government's

5   Exhibit 854.

6         Do you recognize this exhibit?

7   A    Yes.

8   Q    What is this?

9   A    I met him as Rifles, he's also a driver.

10  Q    I'm sorry, what's his name again?

11  A    His nickname is Rifles.

12        MS. ARGO:  At this time the government moves to admit

13  Government Exhibit 884 in evidence.

14        MR. GOLD:  No objection.

15        THE COURT:  Admitted.

16        (Government Exhibit 884, was received in evidence.)

17        MS. ARGO:  Ask to be published to the jury.

18  Q    Delia, you said this is also a driver.

19  A    That is correct, he's one of the drivers.

20  Q    Did he have a particular area that he went to?

21  A    He worked in Queens.

22  Q    I'd like to show just to the witness what's been marked

23  for identification as Government's Exhibit 873.

24        Do you recognize this?

25  A    Yes, I do recognize him.  This is Pinocho, the first

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

Delia – Direct/Argo

1    driver I had to work with.

2         MS. ARGO:  At this time the government moves to admit

3    Government Exhibit 873 into the evidence.

4         MR. GOLD:  No objection.

5         THE COURT:  Admitted.

6         MS. ARGO:  Can we please publish to the jury.

7         (Exhibit published.)

8         (Government Exhibit 873, was received in evidence.)

9    Q    What was this driver's name again?

10   A    I met this driver as Pinocho.

11   Q    Why did they call him Pinocho?

12   A    People called him Pinocho because he has a very big nose.

13        MS. ARGO:  Your Honor, if it's appropriate perhaps now

14   is a good time for a break.

15        THE COURT:  That's fine.

16        THE COURTROOM DEPUTY:  All rise.

17        (Jury exits courtroom.)

18        THE COURT:  I forgot to ask about ION TV, I will when

19   the jury returns.

20        MR. GOLD:  Ten minutes, Judge?

21        THE COURT:  I'm sorry?

22        MR. GOLD:  Ten minute break?

23        THE COURT:  Ten minutes is fine.

24        (Recess.)

25        (In open court; jury not present.)

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

Delia – Direct/Argo

1        THE COURT:  I'm going to ask the question about Ion

2   TV.  If anybody raises their hand, the easiest way to do it

3   we'll bring them to the sidebar and talk about it.

4        MR. GOLUB:  That's fine.

5        MS. ARGO:  Your Honor, should we excuse the witness

6   while you question the witness or should the witness stay here

7   while you have this colloquy with the jury.

8        (Jury enters courtroom.)

9        THE COURT:  I think it's fine.

10       Please be seated.  Ladies and gentlemen, I just wanted

11  to ask you, did any of you watch ION TV over the weekend?

12  Okay.  Thank you.  Go ahead.

13       MS. ARGO:  Thank you, Your Honor.

14  Q    Delia, when you were forced to work in prostitution,

15  approximately how much money did you earn per shift?

16  A    It would depend.  Sometimes it could be a thousand dollars

17  but out of those thousand dollars I would have to give half to

18  the driver, I would get half but then I had to give that to

19  Francisco.  It would depend on how many clients I had during

20  the day.

21  Q    Were you able to keep any of that money for yourself,

22  Delia?

23  A    No, I wasn't able to keep anything.

24  Q    What did your family in Mexico think you were doing in the

25  U.S., if you know?

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

Delia - Direct/Argo

1   A     They -- my family thought I was working.  They also

2   thought that Francisco was working.  That's all they thought

3   about me.  They thought of Francisco as my domestic partner,

4   that we were together.

5   Q     So they thought that Francisco was working -- was

6   Francisco working?

7   A     Most of the time Francisco did not work.  But Francisco

8   sometimes went to an African market, he would work there every

9   once in a while.  Francisco's dad worked there and so Francisco

10  would go there with his uncles to work there, and how I found

11  out -- how I would know that they did -- that he did is because

12  he would smell like fish.

13  Q     Approximately how often would this happen?

14  A     That was very rarely.

15  Q     The apartment that you lived in in Queens, who else lived

16  in the apartment with you?

17  A     For those first few months, Rosalio, Fabiola, the woman

18  that's got her mark on her face, Francisco's dad, another

19  Fabiola, and me.

20  Q     I'm sorry, it was Fabiola can -- you repeat that, I

21  apologize or the court reporter can do it.

22          (Record read.)

23  Q     During this time, based on your observations, what would

24  Rosalio do during the day?

25  A     He would leave.

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

805

Delia - Direct/Argo

1   Q    Do you have any idea where he went?

2   A    He would go out to workout, play handball in the park,

3   that's all I know what -- now what else he did with his time, I

4   don't know.

5   Q    Did he ever mention that he had a job to you?

6   A    No.  He would just go out to play soccer.  He never

7   mentioned that he had a job.

8   Q    What about Francisco, did he ever mention that Rosalio had

9   a job?

10  A    No, he never mentioned to me that Rosalio had a job.

11  Q    You testified that Fabiola with the mark on her face lived

12  in the apartment too with you.  Approximately how long did you

13  live with Fabiola?

14  A    I was living there from October 2010 until April 2014.

15  Q    And was Fabiola with the scar on her face or the mark on

16  her face, was she there the whole time?

17  A    Yes.

18  Q    Did she have a nickname?

19  A    Yes, Francisco and Rosalio would call her Chapparita,

20  Lourdes, and then I called her auntie because she was Rosalio's

21  partner at the time and so since he was Francisco's uncle, out

22  of respect I called her auntie.

23  Q    You mentioned Chapparita and then also Lourdes.  Can you

24  explain the Lourdes nickname?

25  A    Lourdes was her nickname.  Fabiola used Lourdes when she

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

1   worked in prostitution.  The drivers and the clients knew her

2   by that name.

3   Q    Based on your observation who, if anyone, was Fabiola

4   working for?

5   A    Fabiola worked for Rosalio.

6   Q    With respect to the other Fabiola you mentioned, what did

7   she do for work, if you know?

8   A    The only thing I ever knew about the other Fabiola was

9   that she was working in prostitution.

10  Q    Okay.  Delia, on Thursday you testified that your birthday

11  is in May.  What, if anything, was special about your birthday

12  in May 2011?

13  A    I turned 15 in May of 2011.  Francisco bought me a dress.

14  It was a dress that made me look completely like a little girl

15  and then there were fishnets with some flowers on them and

16  that's what he gave me to put on.

17  Q    What, if anything, is special about your 15th birthday in

18  Mexico?

19  A    In Mexico when you turn 15 you celebrate your Quinceanera

20  and you wear a long dress, people dance with you, you get a big

21  cake.

22  Q    How was this Quinceanera for you, Delia?

23  A    Well, that day I had to work in the morning and then in

24  the afternoon.  I had to put on that dress that made me look

25  like a little girl with the fishnets, shoes and then that day

807

Delia – Direct/Argo

1   Francisco gave me alcohol to drink, there was a cake.

2   Q    How did you feel on your Quinceanera?

3   A    Terrible.  Because instead of having a smile on my face,

4   instead of being happy that I had turned 15, celebrating,

5   dancing, just like very young people, I celebrated my 15th

6   birthday by working that day and then working at night.

7   Q    When you say working, what do you mean?

8   A    And drinking alcohol.

9        Could you repeat that.

10  Q    You said you had to work that day and also that night,

11  what do you mean by working?

12  A    I had to work that day in prostitution and then that night

13  Francisco celebrated my birthday.

14  Q    I want to direct your attention to December of 2011.

15  What, if anything, happened then?

16  A    In 2011, that was when Francisco and Rosalio and the

17  uncles went to Mexico and I was left alone with Fabiola, the

18  one who's got the mark on her face.

19  Q    What happened while Francisco and Rosalio were back in

20  Mexico?

21  A    Well, at the time since Francisco wasn't there and didn't

22  have so much control over me, I stopped working two shifts.  I

23  started working one shift because I didn't want to work with

24  drunk clients and the drivers weren't giving me as much work as

25  before.

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

Delia – Direct/Argo

1   Q    What did you do with the money that you did earn while

2   working in prostitution during that time?

3   A    I would send that money to Francisco.  I ended up sending

4   it to -- in his parents -- to his parents name and to his

5   grandparents.

6   Q    How did you send the money?

7   A    I sent it in a post -- I'm sorry, in a money order.

8   Q    Can you explain what you mean by that?

9   A    Yes.  I would go to a place that had a counter.  I would

10  go up, give a name, address and telephone and I would give them

11  the money and they would give me a piece of paper that had some

12  codes on it and I would give those codes to Francisco.

13  Q    You said that you sent money to his parents and

14  grandparents as well period -- sorry, I'm thinking out loud I

15  apologize.  Who, if anyone, instructed you to do that?

16  A    Francisco gave me the instructions so I could send the

17  money.

18  Q    Did he give you any specific instructions about anything

19  that you should give as far as your own information when you

20  went to this place?

21  A    Yes, he said I should do it in my name but with a

22  different date of birth because I was a minor and I had to

23  appear to be 18, but at this place they didn't really ask for

24  an ID with a photograph or name or address or anything.  They

25  just asked for my name and that was it.

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

Delia – Direct/Argo

1   Q    Now you said that Francisco and Rosalio were gone, why did

2   you continue to work in prostitution during this time?

3   A    Francisco went to visit my family.  He went to my parents'

4   house and Francisco told me that if I did not continue working

5   for him, he was going to bring my sister to work and that she

6   would be able to generate twice as much money as I could.

7   Q    Delia, how old was your sister at this time?

8   A    About 12 or 13-years old, I don't remember exactly.

9   Q    How did that make you feel?

10  A    I didn't want my sister to come live what I was living

11  here.  I didn't want anyone else to hurt her the way that I was

12  being hurt at that time.  I was scared that Francisco would

13  bring my sister, that's the reason I kept working so that he

14  wouldn't bring her.

15  Q    Did there come a time when Francisco and Rosalio returned

16  from Mexico?

17  A    Yes.

18  Q    Do you remember approximately when that was?

19  A    That was like at the end of -- you know, it was in the

20  summer, so it was at the end of May or June, but I don't

21  remember the exact month.

22  Q    What, if anything, happened when Francisco and Rosalio

23  returned?

24  A    At that time Francisco started to change towards me.  He

25  became violent.  He wasn't the same as before.  He told me I

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

Delia - Direct/Argo

1   had to keep on working and that I had to go back to working two

2   shifts.  And sometimes at that time Francisco would tell me I

3   love you, I care so much about you one day and the next day he

4   would be abusive towards me.  He would call me an idiot and a

5   stupid person and he would tell me that I wasn't thinking as an

6   adult and I couldn't because I wasn't an adult.

7   Q    When is Francisco's birthday, if you know?

8   A    Francisco's birthday is in the month of June.

9   Q    And in June of 2012, after he returned from Mexico, how

10  old did Francisco turn?

11  A    Francisco turned 18-years old.

12  Q    You said Francisco made you work double shifts, can you

13  explain what those hours are to the jury.

14  A    The first hours were 9 a.m. to 7 p.m. and then 7:30 p.m.

15  to 3 a.m.

16  Q    Delia, were you able to get much sleep during this time?

17  A    No, I couldn't sleep well.  Sometimes I would fall asleep

18  in the car because I was so sleepy.

19  Q    What would you do in those 30 minutes that you had between

20  your shifts?

21  A    I had to change my clothes and take a shower and make

22  myself up so that I could start again.  In those 30 minutes I

23  had to do that so I could start the next shift.

24  Q    When would you eat?

25  A    Sometimes I didn't eat because there was no time.

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

Delia – Direct/Argo

1  Q    Delia, I'm going to direct your attention to the summer of

2  2013 what, if anything, happened then?

3  A    In 2013, I no longer wanted to be with Francisco.  I asked

4  for help from a client.  I asked him to call the police and he

5  called, I don't know if he called Francisco or Rosalio, but

6  they found out.  So when I came back after I continued working

7  and finished my shift I came back to the apartment and

8  Francisco was very mad.

9  Q    What, if anything, did he do at that time, Delia?

10  A    Francisco beat me because I tried to escape.  The next day

11  I was unable to open my mouth.

12  Q    Why were you unable to open your mouth, Delia?

13  A    Because Francisco had beat me in the face.

14  Q    How did he do that?

15  A    I don't remember.

16  Q    What, if anything, did Rosalio say when you returned from

17  your escape attempt?

18  A    Rosalio said that I could not escape because if I did they

19  would kill my family.  They could get a hitman and hire him for

20  50,000 pesos to kill them and they didn't care if kids were

21  killed or grandparents were killed, they were going to kill

22  them all.

23  Q    Prior to Francisco hitting you, had you experienced any

24  problems with your jaw?

25  A    No.

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

812

Delia - Direct/Argo

1  Q    Was this the only time that Francisco hit you?

2  A    He hit me several times.  There were even sometimes where

3  he would pull on my feet as I was sitting on the bed and I

4  would hit the floor and that was so that I could have my

5  period.

6  Q    What do you mean by that, Delia?

7  A    Because I would spend months without having a period and

8  because I was taking birth control pills so that I couldn't

9  become pregnant sometimes my menstruation would take longer.

10  And they would do that to get me to have my period.

11  Q    How did that feel when he did that to you?

12  A    It was very painful.  My waist hurt a lot.  I felt really

13  bad.  I would want him to stop doing it but he would keep on

14  doing it.

15  Q    You said that he also hit you on other occasions, how

16  would he hit you on those other occasions?

17  A    I don't have a lot of memories of how he hit me.

18  Q    I'm going to show you Government's Exhibit 1 that's in

19  evidence.

20       Do you recognize this person?

21  A    Yes, I recognize him, he's Jose Osvaldo.

22  Q    I'm going to show you now what's in evidence as

23  Government's Exhibit 2.

24       Do you recognize this person?

25  A    I recognize him as Miguel Melendez.

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

Delia – Direct/Argo

1   Q    I'm going to show you what's in evidence as Government's

2   Exhibit 3.

3        Do you recognize this person?

4   A    That is Rosalio Melendez.

5   Q    I show you what's in evidence as Government's Exhibit 4.

6        Do you recognize this person?

7   A    That's Francisco.

8   Q    I show you what's in evidence as Government's Exhibit 5.

9        Do you recognize this person?

10  A    That's Abel.

11  Q    What, if any, relationship did Abel have to the other

12  members of the family?

13  A    Abel is Jose Osvaldo, Rosalio and Miguel's cousin.

14  Q    Let me show you what's in evidence as Government's

15  Exhibit 6.

16       Do you recognize this person?

17  A    Yes.

18  Q    Who is this person?

19  A    His name is Fabian.

20  Q    What was his relationship to the family, if you know?

21  A    He was Rosalio, Jose Osvaldo and Miguel's cousin.

22  Q    I'm going to show you what's in evidence as Government's

23  Exhibit 7.

24       Do you recognize this person?

25  A    Her name is Lupe, Guadalupe, and she's Rosalio, Miguel's

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

                        Delia – Direct/Argo

1    and Jose Osvaldo's sister.

2    Q    Is this the same Guadalupe you testified about previously

3    who spoke to you that first time that you were being asked --

4    or being forced to work as a prostitute?

5    A    Yes, that's correct.

6    Q    I'm going to show you what's in evidence as Government's

7    Exhibit 9.

8             Do you recognize this person?

9    A    Yes, I met her as Flor or Veronica.

10   Q    How do you know Veronica?

11   A    I met Veronica in 2010 because she was living with me

12   there.

13   Q    Based on your observations, what did Veronica do for

14   work?

15            MS. KELLMAN:  Objection.

16            THE COURT:  Overruled.

17   A    Veronica worked in prostitution and I know this because

18   Veronica worked with some of the same drivers as me and the

19   drivers talked about her.

20            MS. KELLMAN:  Move to strike.

21            THE COURT:  I would permit that question to be asked

22   in any event.

23            MS. KELLMAN:  But the source of her information.

24            THE COURT:  Oh.

25            MS. ARGO:  We can certainly have a sidebar if Your

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

815

Sidebar

1    Honor would prefer.

2              THE COURT:  Yes.

3              (Continued on the next page.)

Delia – Direct/Argo

1          (The following occurred at sidebar.)

2          MS. ARGO:  Your Honor, the witness testified that she

3   knew about what Veronica did for work because the drivers would

4   talk about her.  It's quite clear --

5          THE COURT:  Right, the drivers I think are --

6          MS. ARGO:  Co-conspirators.

7          THE COURT:  -- co-conspirators.

8          MS. ARGO:  Correct, Your Honor.

9          THE COURT:  By the same token, I don't know what

10  you're.

11         MS. KELLMAN:  That was my --

12         THE COURT:  That was it.  All right.

13         MS. KELLMAN:  All right.  There we are.

14         (End of sidebar conference.)

15         (Continued on the next page.)

16

17

18

19

20

21

22

23

24

25

Delia – Direct/Argo

1            (In open court.)

2    Q    Delia, I'm going to show you what's in evidence as

3    Government's Exhibit 10.

4            Do you recognize this person?

5    A    Yes, I recognize her as Fabiola or Lourdes.  She's the one

6    I used to call auntie, I lived with her.

7    Q    I believe you testified previously that this Fabiola was

8    working in prostitution; is that right?

9    A    That's correct.

10   Q    And based on your observations, who did Fabiola work for?

11   A    Fabiola was working for Rosalio.

12   Q    What, if any, observations did you have regarding their

13   relationship, hers and Rosalio's?

14   A    I remember hearing them fighting.  I remember one time

15   when Rosalio was really drunk and he threw his phone and I

16   could hear that very loudly.  She was scared.

17            MR. DUNN:  Objection, Your Honor, move to strike.

18   A    I was --

19            THE COURT:  Yes, we'll strike she was scared.

20            MS. ARGO:  I think actually the interpreter just

21   wanted to correct her answer.

22            THE INTERPRETER:  Yes, that's correct.  Interpreter

23   correction.  I was scared.

24            THE COURT:  Okay.

25

818

Delia – Direct/Argo

1    BY MS. ARGO:

2    Q    I'm going to show just the witness what's been marked for

3    identification as Government's Exhibit 11.

4         What's depicted in Government's Exhibit 11?

5    A    That's Rosalba.

6    Q    Just to put that in context for the jury, is this Rosalba

7    who had initially introduced you to Francisco through Jose

8    Osvaldo?

9    A    Yes, that's correct.  Rosalba did introduce me to

10   Francisco.

11        MS. ARGO:  At this the government moves to admit

12   Government's Exhibit 11 into evidence.

13        MR. GOLD:  No objection.

14        THE COURT:  Admitted.

15        (Government Exhibit 11, was received in evidence.)

16        MS. ARGO:  Can we please publish that to the jury.

17        THE COURT:  Yes.

18        (Exhibit published.)

19   Q    I'm going to now show you what's in evidence as

20   Government's Exhibit 12.

21        Who is that?

22   A    It's me when I was 14-years old when I was arrested by the

23   border agents.

24   Q    Now just to the witness, let me show you Government's

25   Exhibit 13, what's been marked for identification as

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

                          Delia - Direct/Argo

1    Government's Exhibit 13.

2              Do you recognize this person?

3    A    Yes.

4    Q    Who is this person?

5    A    I don't remember her name right now, but she was --

6    Q    What do you remember about her?

7    A    When she came here to the United States she was working

8    for somebody else, she was working for Fabian.

9              MS. ARGO:  At this time the government moves to admit

10   Government's Exhibit 13 into evidence.

11             MR. GOLD:  No objection.

12             THE COURT:  Admitted.

13             (Government Exhibit 13, was received in evidence.)

14             MS. ARGO:  Can we publish that to the jury.

15             (Exhibit published.)

16   Q    I'm now going to show you what's in evidence as

17   Government's Exhibit -- sorry.  Government's Exhibit 15.

18             Do you recognize that person?

19   A    No, I don't recognize her.

20   Q    I'm going to show you now, just for identification, as

21   Government's Exhibit 16.

22             Do you recognize this person?

23   A    Yes, I do recognize him, that's Abel.

24             (Continued on the next page.)

25

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

Delia – Direct/Argo

820

1      (In open court.)

2   DIRECT EXAMINATION

3   BY MS. ARGO (continuing):

4   Q    Is that the same Abel who is a defendant in this case,

5   sitting at that table?

6   A    Yes, that's correct.

7           MS. ARGO:  At this time the government moves to admit

8   Government Exhibit 16 into evidence.

9           MR. DUNN:  No objection, Your Honor.

10          THE COURT:  Admitted.

11          (Government Exhibit 16 so marked.)

12          MS. ARGO:  If we can publish that to the jury.

13          THE COURT:  Yes.

14          (Published.)

15  BY MS. ARGO:

16  Q    I'm going to show you what's been marked for

17  identification as Government Exhibit 17.

18          What's in Government Exhibit 17?

19  A    That's Cristina who we see.

20  Q    Who else is with her in that picture, if you know?

21  A    She is with Abel.

22  Q    You said Cristina?

23  A    That's correct.

24          MS. ARGO:  At this time the government moves to admit

25  Government Exhibit 17 into evidence.

MICHELE NARDONE, CSR –– Official Court Reporter

Delia – Direct/Argo

1        MR. DUNN:  No objection, Your Honor.

2        THE COURT:  Admitted.

3        (Government Exhibit 17 so marked.)

4        MS. ARGO:  If we can publish that to the jury.

5        (Published.)

6   BY MS. ARGO:

7   Q    Delia, how do you know Cristina?

8   A    I met Cristina because Francisco and Rosalio took me to

9   the place where she -- where Abel and Cristina were living.

10  They would sometimes throw parties, and that's why we would go.

11       Q    (By Mr. Gold) I'm sorry.  I didn't hear that answer.

12       (Record read.)

13       MR. GOLD:  Thank you.

14  Q    Based on your observations, what did Cristina do for work?

15  A    Cristina was working in prostitution also.  She worked for

16  Abel.  I know this because several times we had the same

17  drivers, and they would talk about her.

18  Q    I'm going to show you what's been marked for

19  identification as Government's Exhibit 18.

20       What is depicted in Government's Exhibit 18?

21  A    Who we see here is Rosalio.  I don't recognize the other

22  person.

23       MS. ARGO:  At this time the government moves to admit

24  Government Exhibit 18 into evidence.

25       THE COURT:  Admitted.

MICHELE NARDONE, CSR -- Official Court Reporter

Delia — Direct/Argo

1          (Government Exhibit 18 so marked.)

2          MS. ARGO:  If we could please publish that to the

3     jury.

4          (Published.)

5     BY MS. ARGO:

6     Q    Can you just explain to the jury which person in this

7     picture is Rosalio.

8     A    Of course I can.  Rosalio is the one wearing the red cap

9     and the black and red jacket.

10    Q    I'm going to show you what's been marked for

11    identification as Government's Exhibit 19.

12    A    That's Rosalio.

13         MS. ARGO:  The government moves to admit Government

14    Exhibit 19 into evidence.

15         MR. DUNN:  No objection, Your Honor.

16         THE COURT:  It's admitted.

17         (Government Exhibit 19 so marked.)

18         MS. ARGO:  May we publish that to the jury, please.

19         THE COURT:  Yes.

20         (Published.)

21    BY MS. ARGO:

22    Q    I'm going to show you what's been marked for

23    identification as Government Exhibit 20.

24    A    That's Francisco.  And, well, that's Francisco and

25    Fabian's brother, but I don't remember his name.

MICHELE NARDONE, CSR —— Official Court Reporter

Delia - Direct/Argo

1          MS. ARGO:  I'm going to, at this time, move to admit

2   Government's Exhibit 20 into evidence.

3          MR. GOLD:  No objection.

4          THE COURT:  Admitted.

5          (Government Exhibit 20 so marked.)

6          MS. ARGO:  If we could please publish that to the

7   jury.

8          (Published.)

9   BY MS. ARGO:

10  Q    Can you explain to the jury which person is which in this

11  photograph.

12  A    Yes.  Francisco is wearing the blue tee shirt, and

13  Fabian's --

14         THE INTERPRETER:  Sorry, correction.

15  A    Francisco is wearing the red tee shirt, and Fabian's

16  brother is wearing the blue T-shirt.

17  Q    I now show you what's been marked for identification as

18  Government's Exhibit 21.

19         Who is in this photograph?

20  A    That's Francisco.

21         MS. ARGO:  At this time the government moves to admit

22  Government Exhibit 21 into evidence.

23         MR. GOLD:  No objection.

24         THE COURT:  Admitted.

25         (Government Exhibit 21 so marked.)

MICHELE NARDONE, CSR -- Official Court Reporter

Delia – Direct/Argo

1          (Published.)

2     BY MS. ARGO:

3     Q    At this time I'm going to show you what's been marked for

4     identification as Government Exhibit 22.

5     A    That's me, in 2011.

6          MS. ARGO:  At this time the government moves to admit

7     Government Exhibit 22 into evidence.

8          MR. GOLD:  No objection.

9          THE COURT:  Admitted.

10         (Government Exhibit 22 so marked.)

11    BY MS. ARGO:

12    Q    Delia, what are you drinking here in this picture?

13    A    An alcoholic beverage.

14    Q    Why were you drinking an alcoholic beverage at that time,

15    if you recall?

16    A    I was drinking an alcoholic beverage because -- I don't

17    remember if it was Christmas or New Years.  That was when I

18    started drinking alcohol.

19    Q    Who, if anyone, got you to drink alcohol?

20    A    The first person was Francisco, and Rosalio as well.  He

21    was in charge of making drinks.  But as far as this photo goes,

22    somebody gave it to me.

23    Q    I'm showing you what's been marked for identification now

24    as Government's Exhibit 23.

25         Do you recognize what's in Government's Exhibit 23?

MICHELE NARDONE, CSR -- Official Court Reporter

Delia – Direct/Argo

1    A    Of course I do.  That's Fabiola, Lourdes.

2             MS. ARGO:  At this time the government moves to admit

3    Government Exhibit 23 into evidence.

4             MR. GOLD:  No objection.

5             THE COURT:  Admitted.

6             (Government Exhibit 23 so marked.)

7             (Published.)

8    BY MS. ARGO:

9    Q    You said this is Fabiola, also known as Lourdes?

10   A    Yes.  I also called her Auntie.

11   Q    I'm going to show you what's is in evidence as

12   Government's Exhibit 24.

13            Do you recognize this person?

14            (Published.)

15   A    Yes.  This is Francisco's father.  His name is Magdaleno.

16   Q    I'm going to show you what's been -- what is in evidence

17   as Government's Exhibit 28.

18            Do you recognize this person?

19            (Published.)

20   A    Yes.  I recognize her.  She is Bengy.

21   Q    Who is Bengy.

22   A    Bengy is Jose Osvaldo's partner.  They have a daughter

23   together.  And she also worked in prostitution for Jose

24   Osvaldo.

25   Q    How do you know that?

MICHELE NARDONE, CSR -- Official Court Reporter

Delia – Direct/Argo

1    A    I know this because she worked for the same drivers as I

2    did, and the drivers talked about her.

3    Q    I'm going to show you what's in evidence as Government's

4    Exhibit 29.

5            Do you recognize this person?

6            (Published.)

7    A    Yes, I do recognize her.

8    Q    Who is she?

9    A    Her name is Alicia, and she is Abel's sister.

10   Q    Based on your observations, who did Alicia do for work?

11   A    Alicia worked in prostitution as well, and she used the

12   same driver as I did; and the drivers also spoke about her.

13   Q    I'm going to show you what's in evidence as Government's

14   Exhibit 32.

15           Do you recognize this person?

16           (Published.)

17   A    Yes, I do recognize her.

18   Q    Who is she?

19   A    I met her as Fabiola.

20   Q    Is this the other Fabiola who was living in apartment that

21   you described earlier?

22   A    Yes, that's correct.

23   Q    I will now show you what's in evidence as Government's

24   Exhibit 44.

25           Do you recognize this person?

MICHELE NARDONE, CSR –– Official Court Reporter

Sidebar

1          (Published.)

2    A    Yes, I recognize her.  I don't remember her name, but she

3    lived with Abel as well, and she worked in prostitution; and

4    the drivers also spoke of her.

5    Q    Did you ever have any conversations with Alicia about this

6    person that you see in this picture here and the other person

7    you had identified before, Cristina?

8              MR. HUESTON:  Objection, Your Honor.

9              Can we have a brief sidebar?

10             THE COURT:  Yes.

11             MR. HUESTON:  Thank you.

12             (Continued on the next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

MICHELE NARDONE, CSR —— Official Court Reporter

1          (Sidebar conference.)

2          THE COURT:  I know we have discussed it, but I just

3    want a complete proffer this time.

4          MS. ARGO:  Of course, Your Honor.  I believe that the

5    evidence adduced thus far in this trial has made clear that

6    Alicia was in fact a co-conspirator, assisted in this

7    conspiracy.  Therefore, what she says is actually a

8    co-conspirator statement.

9          THE COURT:  This is on the phone.  So how do you know

10   what Cristina is saying?

11         MS. ARGO:  Actually, I don't think I specified it was

12   on the phone.  I just asked if Alicia had ever said anything to

13   her about these two women.

14         THE COURT:  If Alicia said anything to her about Abel?

15         MS. ARGO:  About Cristina and the other woman she just

16   identified as working in prostitution and living with Abel.

17         MR. HUESTON:  Your Honor, two things.  One, as far as

18   this witness is concerned, in terms of their theory, what her

19   knowledge is, is she a victim or is she a co-conspirator?  She

20   described herself as working in prostitution.  She hasn't

21   talked about any instructions.

22         THE COURT:  She didn't really need instructions.

23         You can go ahead.

24         MS. ARGO:  Your Honor, also, this is not necessarily

25   being offered for the truth.  It's simply a statement about

MICHELE NARDONE, CSR -- Official Court Reporter

Sidebar

1    their relationship, as far as like what was happening between

2    them, what she understood that to be.  It was just her

3    understanding.

4           MR GOLUB:  It is being offered for the truth.  That's

5    exactly what it is.

6           MS. ARGO:  It's the effect on the listener, just that

7    she understood the relationship.  It's not necessarily true.

8           THE COURT:  It's not being offered for the effect on

9    her.  It's being offered to communicate that these people were

10   prostitutes is there.

11          MS. ARGO:  Ultimately, Your Honor, I would still say

12   that here, in fact, Alicia is, in fact, a co-conspirator.

13          THE COURT:  But you tell us why you know Alicia is a

14   co-conspirator at this point in trial.

15          MS. ARGO:  The evidence we have adduced thus far.  I

16   believe there are witnesses that have testified.

17          MS. HAJJAR:  If you give us a minute, Your Honor, we

18   can try to set an adequate foundation with this witness.

19          MS. ARGO:  Yes.  Just one second.

20          THE COURT:  Okay.

21          (Pause.)

22          MS. ARGO:  Your Honor, I believe I can back up and

23   provide a little bit of foundation that might assist in this

24   line of questioning.

25          THE COURT:  Why don't you go ahead and try before you

MICHELE NARDONE, CSR -- Official Court Reporter

Delia − Direct/Argo

1   ask the questions, and we can come back here and discuss the

2   further questions that are asked.

3           MS. ARGO:  All right, Your Honor, sounds like a good

4   idea.

5           (End of sidebar conference.)

6           (Continued on the next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Delia – Direct/Argo

1          (In open court.)

2    BY MS. ARGO:

3    Q    Delia, with regard to Alicia, who you mentioned before,

4    you testified previously that that's Abel's sister; is that

5    right?

6    A    (In English) Yes, that's correct.

7          (Through the interpreter) Yes, that's correct.

8    Q    With regard to Cristina, and Alicia, what, if anything,

9    did you observe?

10         MS. ARGO:  Without getting into something that she

11   said.  I think she was going to say something she said.

12   Q    Without getting into something Alicia said, what, if

13   anything, did you observe with regard to Alicia and Cristina?

14         THE INTERPRETER:  I'm sorry.  The interpreter did not

15   interpreter her answer.

16         THE COURT:  That's all right.  We don't want to hear

17   the answer.  We will just try the next question.

18   A    What I was able to observe is that they were both working

19   in prostitution.

20   Q    Did you ever see Cristina outside the house by herself?

21         MR. HUESTON:  Objection to the leading.

22         THE COURT:  I'm going to permit it.

23   A    No.

24   Q    Who, if anyone, was with her?

25   A    She would be with Abel or with Alicia.

MICHELE NARDONE, CSR –– Official Court Reporter

Delia – Direct/Argo

1    Q    Do you have any understanding, based on your observations,

2    as to why that would be?

3              MR. HUESTON:  Objection, Your Honor.

4              MS. ARGO:  Honestly, I don't know what her answer is

5    going to be.

6              THE COURT:  Have you any understanding, based on your

7    observations, as to why that would be, I'm going to allow it.

8              Go ahead.

9    A    I didn't understand why there was someone always with her.

10   Q    With regard to Cristina, where did she live?

11   A    She went to live at the address on 103rd with Abel.

12   Q    Where, if you know, did this woman work in Government's

13   Exhibit -- live.  Let me try that again.

14             Where, if you know, did the woman in Government's

15   Exhibit 44 live?

16   A    She was living in the basement with Alicia and her partner

17   and Abel, who was with Cristina and with her at the same time.

18   Q    Can you explain that to the jury?

19   A    Yes.  Sometimes I would see Abel with her, and then other

20   times I would see him with Cristina; and it was confusing to me

21   to see him with two women, like living with both of them.

22   Q    You said that Alicia lived somewhere near both of these

23   women.

24             If you could just explain that to the jury a little

25   bit more.

MICHELE NARDONE, CSR -- Official Court Reporter

833

Delia – Direct/Argo

1   A    Alicia was living with her in the same apartment, an

2   apartment, and Cristina was living in a different place.

3          THE COURT:  Who is "her"?

4          MS. ARGO:  Yes.  That's exactly what I was going to

5   ask, Your Honor.

6   Q    You said -- can you just start over --

7          MS. ARGO:  And maybe the court reporter can read back

8   the question, and I will be able to pointedly ask the question

9   a little better.

10         THE COURT:  Yes.

11         (Record read.)

12  Q    When you say that Alicia was living with her, who are you

13  referring to?

14  A    To the girl who is in the picture.  As I said before, I

15  don't remember her name.

16  Q    That's the girl that you say was living with Alicia?

17  A    That's correct.

18  Q    Then previously you testified, though, that you also seen

19  Cristina only outside the house with either Abel or Alicia.

20  A    That's correct.

21  Q    Not going to the content of what was said, did Alicia ever

22  talk about Cristina?

23  A    Yes, she did talk about Cristina.

24  Q    Without going into the content of what was said, did

25  Alicia ever talk about Lizbeth -- I'm sorry -- the girl in

MICHELE NARDONE, CSR -- Official Court Reporter

Sidebar

1  Government's Exhibit 44?

2  A     She said to me that --

3           MR. HUESTON:  Objection.

4           THE COURT:  Yes.  Rephrase the question.

5           MS. ARGO:  Sure.

6  Q     Without going into the content of what was said, did

7  Alicia ever talk to you about the girl in Government's Exhibit

8  44?

9           THE COURT:  Just a yes-or-no answer.

10 A     Yes.

11 Q     Did you ever hear discussions between Abel and Alicia

12 regarding these women working in prostitution?

13 A     No.

14 Q     Did you hear Alicia ever have a conversation regarding

15 these women working in prostitution?

16 A     Yes.

17          MS. ARGO:  If we could have a brief sidebar, Your

18 Honor?

19          THE COURT:  Yes.

20          (Continued on the next page.)

21

22

23

24

25

MICHELE NARDONE, CSR -- Official Court Reporter

Sidebar

1          (Sidebar conference.)

2          THE COURT:  Assuming that we have Alicia as a

3    co-conspirator, now the question is how any statement is going

4    to be in furtherance of the conspiracy, et cetera.  I don't

5    know what the statement is going to be.

6          MS. ARGO:  So I think she will explain how that

7    statement -- I mean, the statement is, I believe, in

8    furtherance of the conspiracy.  I think it's been established

9    that Alicia was aware of both of these women's existence, that

10   they were both working in prostitution; that they both had

11   relations with Abel; that Abel was living in both places; that

12   Cristina was never seen inside the house without Alicia or Abel

13   being present.

14          Based upon all that information, it can be inferred

15   that she is a co-conspirator; and I can proffer that she would

16   say that the conversation that she had with Alicia was to make

17   sure these girls stay separate and that Delia didn't tell

18   either of these girls that one or the other assisted --

19          THE COURT:  Who had that conversation?

20          MS. ARGO:  Alicia and Delia, that the whole point was

21   to keep them separate.

22          THE COURT:  To keep them separate, so that was in

23   furtherance?

24          MS. ARGO:  Yes.

25          MR. HUESTON:  So that's the answer to the question,

Sidebar

1    when you asked did you have a conversation.

2          MS. ARGO:  With Alicia.

3          MR. HUESTON:  This is Delia we are talking about?

4          MS. ARGO:  Yes, her own conversation with Alicia.

5          THE COURT:  And Alicia told her that they would just

6    stay apart.

7          MS. ARGO:  I believe so, yes, Your Honor, that she was

8    not to say anything about the other.

9          THE COURT:  Who told her that?

10         MS. ARGO:  Alicia.

11         THE COURT:  Alicia told her?

12         MS. ARGO:  Uh-huh.

13         THE COURT:  Right.  Oh, that's fine.  Okay.  That will

14   do it.

15         MR. HUESTON:  Your Honor, I don't think it's in

16   furtherance of the conspiracy; and I do think that, you know,

17   we had --

18         THE COURT:  Let me just respond to that.  In my mind,

19   it furthers the conspiracy in the sense that Abel did not --

20   Abel wanted his business to go forward without these two ladies

21   being at each other's throat; and, in that sense, it definitely

22   furthered the conspiracy.

23         MR. HUESTON:  The only thing I would add, Your Honor,

24   when we are looking at statements that were possibly going to

25   be proffered, this statement, it sort of changed for this

Delia - Direct/Argo

1    witness, something that we hadn't seen.

2         I will be cross examining her, but I do maintain my

3    position.  I understand the court's ruling, but I think I have

4    made a sufficient record and we can go on from there.

5         THE COURT:  Okay.  I mean I think the record that we

6    have made on the admissibility of what we anticipate to come

7    out is that Alicia, who is a co-conspirator, told Delia, who is

8    on the stand, that these women should not know about each

9    other; and, in that sense, I think it's in furtherance of the

10   conspiracy, of Abel's involvement in the conspiracy, because

11   that was one way he was going to hold it all together, by

12   keeping them separate.

13        MS. ARGO:  That's correct, Your Honor.

14        (End of sidebar conference.)

15        (Continued on the next page.)

16

17

18

19

20

21

22

23

24

25

MICHELE NARDONE, CSR -- Official Court Reporter

Delia – Direct/Argo

1        (In open court.)

2   BY MS. ARGO:

3   Q    Delia, I had asked you previously about a conversation

4   that you had had with Alicia, regarding Cristina and this girl

5   in Government's Exhibit 44.

6        Can you explain what that conversation was?

7   A    Yes.  Alicia told me that Cristina found out that Abel had

8   another girl working for him, and Cristina contacted the girl

9   in the photo and then she found out too that Abel had Cristina.

10  Q    I will now show you what's been marked for identification

11  as Government's Exhibit 45.

12       Do you recognize what's in this photo?

13  A    It's Francisco.

14       MS. ARGO:  I ask that Government's Exhibit 45 be

15  admitted into evidence.

16       MR. GOLD:  No objection.

17       THE COURT:  Admitted.

18       (Government Exhibit 45 so marked.)

19       MS. ARGO:  May we publish that to the jury?

20       THE COURT:  Yes.

21       (Published.)

22  BY MS. ARGO:

23  Q    Do you know what's going on in this picture, with

24  Francisco?

25  A    I don't know.

MICHELE NARDONE, CSR –– Official Court Reporter

Delia – Direct/Argo

1   Q    I'm going to show you what's been marked for

2   identification as Government's Exhibit 46.

3           What's in Government's Exhibit 46, if you know?

4   A    That's Francisco who we see.

5   Q    I'm sorry?  What was that?

6           THE INTERPRETER:  "That's Francisco who we see."

7           MS. ARGO:  At this time the government moves to admit

8   Government Exhibit 46 into evidence.

9           MR. GOLD:  No objection.

10          THE COURT:  Admitted.

11          (Government Exhibit 46 so marked.)

12          (Published.)

13  BY MS. ARGO:

14  Q    Do you have any recollection of what was going on in this

15  picture?

16  A    I don't remember having seen this place or the photo.

17  Q    But you do recognize who it is in the photo, right?

18  A    Yes.  I recognize Francisco.

19  Q    Do you recognize -- strike that.

20          The clothing that he is wearing in this photograph,

21  are those typical clothes that Francisco would wear?

22  A    Yes.  Francisco used to dress like that, and plus he used

23  to dress like that to go to parties.

24  Q    I'm going to show you what's been marked for

25  identification as Government's Exhibit 854.  I'm sorry.  We

MICHELE NARDONE, CSR -- Official Court Reporter

Delia – Direct/Argo

1    have already went through that one.  My apologies.

2              I'm going to now move to 855 for identification, just

3    to the witness.

4              Do you recognize this photo?

5    A    Yes.

6    Q    What's this a photo of?

7    A    Francisco took me to the circus that day, but just for a

8    short while.  I had to go to work after that.

9              MS. ARGO:  At this time the government moves

10   Government Exhibit 855 into evidence.

11             MR. GOLD:  No objection.

12             THE COURT:  Admitted.

13             (Government Exhibit 855 so marked.)

14             (Published.)

15   BY MS. ARGO:

16   Q    You said this was at the circus?

17   A    That's correct.

18   Q    I'm going to show you what's been marked for

19   identification as Government's Exhibit 856.

20             Do you recognize what's in this photo?

21   A    Yes.  This is Benjamin, Jose Osvaldo, Rosalio's, and

22   Miguel's brother.

23             MS. ARGO:  At this time the government moves to admit

24   Government Exhibit 856 into evidence.

25             THE COURT:  Admitted.

MICHELE NARDONE, CSR –– Official Court Reporter

841

Delia - Direct/Argo

1        (Government 856 so marked.)

2        (Published.)

3   BY MS. ARGO:

4   Q    Do you know where this photo was taken?

5   A    This was at the house of Francisco's parents.

6   Q    Is that in Tenancingo, Mexico?

7   A    Yes.  This photograph was taken in Tenancingo.

8   Q    Now, I show you what's been marked for identification as

9   Government's Exhibit 857.

10       Can you describe what's in this photo?

11  A    Yes.  This photograph was taken at my birthday when I

12  turned 16.

13       MS. ARGO:  The government moves to admit Government

14  Exhibit 857 into evidence.

15       THE COURT:  Admitted.

16       MR. GOLD:  I'm sorry.  Is that 857?

17       MS. ARGO:  Yes, 857.

18       (Government Exhibit 857 so marked.)

19       (Published.)

20  BY MS. ARGO:

21  Q    Delia, you said this was taken at your birthday?

22  A    Yes, that's correct.  The person who is next to me is

23  Veronica.

24  Q    What's on your face in this picture?

25  A    I have cake on my face.

MICHELE NARDONE, CSR -- Official Court Reporter

Delia – Direct/Argo

1   Q    Why is that?

2   A    Because Veronica pushed me into the cake.

3   Q    Is that something that is commonly done?

4   A    Yes.

5   Q    Is that sort of a Mexican tradition, if you know?

6   A    I don't know.

7   Q    Just for a moment, I see that Veronica has her arm around

8   you in this picture.

9        Delia, during time that Francisco forced you to work

10  in prostitution, did you have any friends?

11  A    The people I would talk to were Fabiola and Veronica.  I

12  had no other friends besides them.

13  Q    Why is that, if you know?

14  A    Because I didn't interact with any other people.  I would

15  just spend my time with the drivers, with her, or Fabiola.

16  Q    I'm going to show you what's been marked for

17  identification as Government's Exhibit 857A.

18       What's in this photograph, if you know?

19  A    Well, there is me, together with Rosalio, Jose Osvaldo's

20  cousin, and Cecilio.  They came to my birthday that day.  He is

21  also one of the men who would pass out chicas cards.

22       MS. ARGO:  At this time the government moves to admit

23  Government's Exhibit 857A into evidence.

24       MR. GOLD:  No objection.

25       THE COURT:  Admitted.

MICHELE NARDONE, CSR -- Official Court Reporter

Delia – Direct/Argo

1    (Government Exhibit 857A so marked.)

2    (Published.)

3    BY MS. ARGO:

4    Q    You say you are referring to the man on the far right

5    corner of the picture, the far right side of the picture?

6    A    Yes, that's correct.

7    Q    Is there anything else this man would do besides pass out

8    the chica cards?

9    A    He also sold boxes of condoms, which I knew to be called

10   chocolates; and his wife would go around dropping them off.

11   Q    Who is the individual to the left of you in that picture?

12   A    Those would be his daughters.

13   Q    I'm sorry?

14   A    His daughters.

15   Q    I'm sorry.  To the left of you in this picture.

16   A    Those are Cecilio's two daughters.

17   Q    Who is on the other side of you in this picture?

18   A    That's Cecilio's wife.

19   Q    I'm going to show you what's been marked for

20   identification as Government's Exhibit 858.

21          Do you recognize what's in this picture?

22   A    It's a photo of carnival.  I got it off Facebook, but I

23   don't remember if it was Jose Osvaldo's or Miguel's.

24   Q    When you say "carnival," can you be more specific?

25   Carnival where?

MICHELE NARDONE, CSR –– Official Court Reporter

Delia – Direct/Argo

1   A    It's carnival in Tenancingo.  It's a celebration.  It's

2   traditionally held in January or February.  I don't remember

3   the month, but they celebrate carnival and they take pictures,

4   always take pictures.

5   Q    And the outfits in this picture, are these typical outfits

6   that are worn during Tenancingo carnival, if you know?

7   A    They usually wear three different outfits, different ones,

8   not the same ones.

9   Q    So they change outfits throughout carnival?

10  A    Yes.

11         MS. ARGO:  At this time the government moves to admit

12  Government Exhibit 858 into evidence.

13         MR. GOLD:  No objection.

14         THE COURT:  Admitted.

15         (Government Exhibit 858 so marked.)

16         (Published.)

17  BY MS. ARGO:

18  Q    In this photograph, what are on these individuals' faces?

19  A    They are wearing masks so nobody will know who they are.

20  Q    What are they carrying in their hands, if you know?

21  A    It's -- I don't remember the name of it.  Well, it's like

22  a whip.  So they hit each other with them.  And there is a bit

23  of lead at the tip.  Francisco told me this at one time, that

24  they put lead on the tips so they can hit each other with that.

25  Q    These whips, is that what you are referring to, they have

MICHELE NARDONE, CSR -- Official Court Reporter

                          Delia - Direct/Argo

1    lead in the ends?

2    A    Yes.  I don't know why.  I never actually saw that.

3    Q    Okay.  Moving onto Government's Exhibit 859, just marked

4    for identification, just for the witness.

5         Do you recognize what's in this picture?

6    A    Yes.  It's me with cake on my face.

7         MS. ARGO:  At this time the government moves to admit

8    Government Exhibit 859 into evidence.

9         THE COURT:  Admitted.

10        (Government Exhibit 859 so marked.)

11        (Published.)

12   BY MS. ARGO:

13   Q    Is that from the party you were talking about earlier?

14   A    Yes, that's correct.

15   Q    Do you recall if you had to work on this day as a

16   prostitute?

17   A    Yes, I had to work.

18        MS. ARGO:  If we could show the witness Government's

19   Exhibit 860 for identification.

20   Q    Do you recognize Government's Exhibit 860?

21   A    Yes, I recognize it.  It's me with Francisco.

22        MS. ARGO:  At this time the government moves to admit

23   Government Exhibit 860 into evidence.

24        MR. GOLD:  No objection.

25        THE COURT:  Admitted.

MICHELE NARDONE, CSR -- Official Court Reporter

846

Delia – Direct/Argo

1      (Government Exhibit 860 so marked.)

2      (Published.)

3      MS. ARGO:  If we could publish that to the jury as

4  well.

5  BY MS. ARGO:

6  Q    Delia, do you know which birthday this was?

7  A    When I turned 17.

8  Q    What's on your face in this picture?

9  A    Cake.

10  Q    Delia, do you recall if you had to work in prostitution on

11  this day?

12  A    Yes.  It didn't matter if there was a party.  I would have

13  to work in the morning.

14  Q    I'm going to show you what's been marked for

15  identification as Government Exhibit 861.

16  A    That's me.

17      MS. ARGO:  At this time the government moves to admit

18  Government Exhibit 861 into evidence.

19      MR. GOLD:  No objection.

20      THE COURT:  Admitted.

21      (Government Exhibit 861 so marked.)

22      (Published.)

23  BY MS. ARGO:

24  Q    Can you describe what we see in this picture?

25  A    It's me.  I'm standing there posing for a picture.

847

Delia – Direct/Argo

1    Q    Where are you standing?

2    A    I'm standing in the room where Francisco and I lived.

3         THE INTERPRETER:  Interpreter correction, the bedroom.

4    Q    I'm going to show you what's been marked for

5    identification as Government Exhibit 862.

6         Do you recognize what is in this photo?

7    A    Yes.  This is a photograph of Francisco.  He had gotten

8    that tattoo.  I was the one that took this picture of him.

9         MS. ARGO:  At this time the government moves to admit

10   Government Exhibit 862 into evidence.

11        MR. GOLD:  No objection.

12        THE COURT:  Admitted.

13        (Government Exhibit 862 so marked.)

14        (Published.)

15   BY MS. ARGO:

16   Q    You mentioned this tattoo.

17        Where is the tattoo in this picture?

18   A    It's on his arm.

19   Q    What is it a tattoo of, if you know?

20   A    It's a tattoo of Saint Michael, who is -- Miguel, or

21   Michael.  He is the patron saint of Tlaxcala, Saint Michael the

22   Arcangel.

23   Q    Did you know if anyone else in the Melendez family had a

24   tattoo like this?

25   A    I remember that Rosalio had a tattoo with a dragon.

MICHELE NARDONE, CSR -- Official Court Reporter

USA v. Melendez-Rojas, et al.

1       MS. ARGO:  Your Honor, I have a few more pictures that

2   I want to go through with the witness, but it is almost

3   1 o'clock.  I wonder if this is a good time to break.

4       THE COURT:  It's fine.

5       Ladies and gentlemen, can you be back in the jury room

6   at ten minutes of 2:00.  Does that give you enough time for

7   lunch?

8       THE CLERK:  All rise.

9       (Jury exits.)

10      THE COURT:  Okay.

11      (Lunch recess.)

12      (Continued on the next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

MICHELE NARDONE, CSR -- Official Court Reporter

1                 A F T E R N O O N     S E S S I O N

2               (In open court; jury not present.)

3               THE COURT:  Mr. Gold, just let me know if you want to

4    break before the cross.

5               MR. GOLD:  Thank you so much.

6               THE COURT:  Any time you want a break just...

7               MR. GOLD:  I appreciate it.  Thank you.

8               THE COURT:  I offer you the option of crossing seated,

9    but I don't think you'll accept it.

10              MR. GOLD:  Not yet, thank you.

11              THE COURT:  You want to bring the witness in.

12              About how much longer do you think you'll be on

13   direct?

14              MS. ARGO:  I'm sorry, Your Honor, my estimate gets all

15   messed up because we're doing this in Spanish.  I think it

16   would be 35, 40 minutes to be safe.

17              THE COURT:  Okay, fine.  I didn't mean to lengthen the

18   trial.

19              MS. ARGO:  It's fine, Your Honor.  I understand.

20              THE COURTROOM DEPUTY:  All rise.

21              (Jury enters courtroom.)

22              THE COURT:  Please be seated.  Ms. Argo.

23              MS. ARGO:  Thank you, Your Honor.

24

25

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

850

Delia – Direct/Argo

1    DIRECT EXAMINATION

2    BY MS. ARGO (continuing)

3    Q    Delia, when we spoke this morning we were talking about

4    some photographs and going through those.  And with an

5    understanding from defense counsel I now would like to offer

6    the following exhibits into evidence.  That's Government's

7    Exhibit 853 and 865 through 874C into evidence.

8              MR. GOLD:  No objection.

9              THE COURT:  Admitted.

10             (Government Exhibits 853, 865 through 874C, were

11   received in evidence.)

12   Q    Let's start with Government's Exhibit 865 and let's please

13   publish that to the jury.

14             (Exhibit published.)

15   Q    Delia, can you tell the jury what's in Government's

16   Exhibit 865?

17   A    I'm not able to see anything.

18             Of course that's a photo of Francisco with his father

19   Magdaleno.

20   Q    Moving on to Government's Exhibit 866.  What's in this

21   photograph?

22   A    That's me with Francisco.  We were at the beach.

23   Q    Do you remember when this was?

24   A    I don't remember when that photo was taken.

25   Q    I show you what's in evidence as Government's Exhibit 867.

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

Delia – Direct/Argo

1        What's in this photograph?

2   A    That's me with Francisco.

3   Q    Moving on to Government's Exhibit 868.  Who's in this

4   photograph?

5   A    Is this photo there is Francisco with Rosalio.

6   Q    With respect to the way they are dressed, do you have any

7   sense of what was going on in this photograph?

8   A    Well, Francisco liked to dress that way.

9   Q    When you say that way, what do you mean by that?

10  A    Well, Francisco likes to dress like that when they go to

11  parties, when they go out.

12  Q    Let's go to Government's Exhibit 869.  What's in this

13  photograph?

14  A    In this photograph it is Francisco's Facebook, the only

15  thing is that he uses a different name.

16  Q    How do you know that this is Francisco's Facebook?

17  A    He had some photos on that Facebook, some photos of his.

18  Q    Moving on to Government's Exhibit 870.  What do you see in

19  this photograph?

20  A    In this photo I can say Jose Osvaldo, Rosalio, Miguel,

21  Miguel, Miguel Melendez-Romero, Miguel Melendez, Fortino,

22  Benjamin and Fabian's brother.

23  Q    There seems to be names above these photographs, who put

24  those there?

25  A    I myself put those names on there.

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

Delia – Direct/Argo

1    Q    And what is in the background behind these men?

2    A    It's a kite.

3    Q    Where was this photograph taken, if you know?

4    A    That photo was taken in Tenancingo.

5    Q    It appears that there are letters on that kite, do you see

6    those letters are?

7    A    Yes, it has the C and the H.

8    Q    Do you have any idea why the C and the H are on that kite?

9    A    I don't know what it means to them.

10   Q    With respect to the family, the Melendez-Rojas family, did

11   the family itself have a nickname, if you know?

12   A    Yes.  They are known as Los Chechas.

13   Q    Los Chechas?

14   A    Yes, that's right.

15   Q    With respect to the individuals you identified earlier, so

16   Jose Osvaldo first of all, did he have a nickname that you knew

17   of?

18   A    Yes, I met him as Checha.  I know that they called him

19   Checha.

20   Q    When you say "they" who are you referring to?

21   A    Francisco, Rosalio, Miguel.

22   Q    And as for Miguel, did Miguel have a nickname, if you

23   know?

24   A    Yes, he would be called Memelas.

25   Q    What about Rosalio, did he have a nickname?

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

Delia – Direct/Argo

1    A    Yes, he had a nickname but I can't remember it right this

2    second.

3    Q    Okay, what about Francisco, did he have a nickname?

4    A    Yes.  Francisco was known as Mojarro.

5    Q    What about Abel, did Abel have a nickname?

6    A    Yes, Abel, when I met him, it was as Borrego.

7    Q    Thank you.

8         Moving on to Government's Exhibit 871.  Who is

9    depicted in this photograph?

10   A    That's Jose Osvaldo.

11   Q    And moving on to 872, who is in this photograph?

12   A    In this photo it's Miguel, Rosalio and Magdaleno.

13   Q    With respect to Magdaleno, which one is he out of the

14   three?

15   A    He's wearing like a shirt that looks like it's black and

16   blue, purple.  He's right next to the person who is wearing

17   blue.

18   Q    Okay.  There's three people in the photograph.  If the

19   person on the left is number one, where is Magdaleno?

20   A    The third one.

21   Q    Did Magdaleno have a nickname, if you know?

22   A    Yes, he would be called Tiburon.

23   Q    And there's one other brother I think you have mentioned

24   before, Benjamin, right?

25   A    Yes, that's correct.

Delia – Direct/Argo

1  Q    Did Benjamin have a nickname, if you know?

2  A    Yes, he would be called El Capitan.

3  Q    Did he have any other nicknames that you know of?

4  A    Benjie.

5  Q    Let's move on to Government's Exhibit 873.  This one we've

6  already seen, right?

7  A    Yes, that's right.

8  Q    Who is that?

9  A    That's Pinocho.  He's the first driver with whom I started

10  working the first time.

11  Q    Let's talk about your work in prostitution.  What, if

12  anything, happened to you physically from clients while you

13  were working in prostitution?

14  A    There were clients that were in different places who

15  pushed me down the stairs from the second floor.  There was

16  also a client who pushed me into the closet, hitting my head

17  and I lost consciousness for a few seconds and then I came to.

18       There was also a client who threatened me with killing

19  me.

20  Q    Can you explain to the jury what happened in that

21  instance?

22  A    Yes.  In April of 2014 I tried to -- I was working in

23  White Plains.  And the first client who called when it was time

24  to charge him the fee he said he didn't have any money and that

25  he would pay me with a piece of gold jewelry.  And I knew at

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

Delia – Direct/Argo

1    the time that I could not come back with any jewelry on me

2    because Rosalio had told me one time to never accept jewelry

3    from clients because they might say often that it's gold but

4    then it's not.

5            And I told the client that I could not accept that and

6    he said that he wanted to have sex; I said no and he pulled out

7    a knife and he threatened me and he said that if I didn't do it

8    he was going to kill me because being a prostitute was no kind

9    of life to lead.  What he said was, I'm going to give you a

10   lesson so you stop working in this.

11           He wanted to have unprotected sex without a condom.  I

12   said no, and I had to tell him that I had AIDS.

13   Q    Were you lying to him?

14   A    Yes, I was lying to him.

15   Q    What happened then?

16   A    He forced me to have sex with him.  I remember that I was

17   able to call the driver without the client noticing but he

18   never came to help.  He could hear me saying, let me go, that I

19   didn't want to be there anymore and he would tell me no, this

20   is just for you to get a lesson and if I see you again I will

21   kill you because I'm everywhere.

22           At that moment I was scared, I had no other choice but

23   to cooperate with the client.  He hurt me with the knife on the

24   side, on the side of my body.  It was just with the point of

25   the knife.

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

Delia – Direct/Argo

1    Q    Were you bleeding?

2    A    Just slightly.

3    Q    How did you feel in that moment?

4    A    I felt unprotected.  I was scared because I didn't want

5    him to kill me.

6    Q    After this incident with this client did you call

7    Francisco?

8    A    Yes, I called Francisco, I told him what had happened and

9    I told him I didn't want to be there anymore and his reply to

10   me was you have to keep on working, you cannot go back.  He

11   didn't care about what was happening.  He hung up on me.  I

12   told the driver I wanted to leave; he said no.

13        Francisco called me –– then Francisco called me back

14   and he said, all I want to say to you is that I got a call from

15   my mother to say that my grandmother had just died and that's

16   the reason why you have to keep on working.  I felt that

17   Francisco didn't love me anymore at that time.  I felt

18   unprotected by him.  I felt he didn't want me there.

19   Q    What, if anything, did you do as a result of what happened

20   with this client?

21   A    I made the decision to escape the next day.

22   Q    How were you able to escape?

23   A    Early in the morning Francisco and Rosalio left the

24   apartment, I was alone, I thought nobody was there.  I had a

25   suitcase, a laptop, a phone, a camera, some photos.  I had

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

Delia - Direct/Argo

1   clothes also in the suitcase and three pairs of new sneakers

2   that Francisco had bought with the money I had been making.  I

3   also took some notebooks with me which had names of drivers in

4   them and then when I thought nobody was at home, to my surprise

5   Fabiola, the one with the mark on her face, was there and she

6   asked me if I was going to leave.  So I said yes, I was and I

7   was escaping.  I said to her did she want to come with me, I

8   asked her, she said no, because she was afraid that Rosalio

9   would beat her so she had to stay there.  She said she was

10  going to call Rosalio to tell him that I was leaving and she

11  was going to give me two minutes.

12  Q   So what happened?

13  A   I was able to call a taxi, because days before when I had

14  been to this house in Queens I had seen that there was a place

15  that had rooms for rent, so I went to that address.  I spent --

16  I --

17           THE INTERPRETER:  May the interpreter clarify.

18  A   I had stopped by there several days before but the place

19  that I went to, the person who opened the door said that the

20  room had been rented, there were no other rooms, so I said I

21  had no place to stay.  I said to this person, well, I need a

22  place to go, I don't care, I can pay and she said, okay, you

23  can stay here.  She let me stay in a place that was very small,

24  it was like a closet.

25  Q   How did you have money for the taxi and for the room?

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

Delia – Direct/Argo

1   A    Well, I had worked the day before so that's the money that

2   I took.

3   Q    And once you had this small room, what happened next?

4   A    I cried a lot.  I didn't like where I was.  I didn't know

5   what to do with my life.  I didn't want to work in prostitution

6   anymore.  I didn't want this life anymore.  I talked with this

7   woman about what I had gone through and she said you should go

8   to the police.  But she said I couldn't stay at her house

9   anymore, and she was from Tlaxcala.

10  Q    So what did you do?

11  A    So she said I have this friend, he's from Ecuador, you can

12  go to his apartment; I did.  I had to pay rent, I didn't have

13  any money at the time.  So I went to this Ecuadorian man's

14  apartment, I left my things there.  I was looking for work.  I

15  remember I bought some Medicaid things, I didn't want to do

16  this anymore for work.

17         So that night so I took a walk, I walked around the

18  park.  I didn't know what to do.  I had no family here in the

19  United States.  I spoke Spanish.  It was my second language.

20  There was a man there in the park who saw me walking in circles

21  and he asked me if I was okay.  So I said no, I needed help.

22  And he said to me, well, what happened.  And I said my

23  boyfriend beat me, I want to go to the police.  The man said he

24  was willing to take me and drop me off near the precinct.  It

25  was nighttime and if I went by myself something might happen to

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

Delia – Direct/Argo

1   me, so he took me and dropped me off near a police precinct in

2   Queens.

3   Q    How did you feel about going to the police?

4   A    I was afraid because I didn't know what the police were

5   going to say to me.  I had no other option.

6   Q    So did you go into the precinct?

7   A    Yes, I did go into the precinct.

8   Q    What happened?

9   A    I got there, I didn't speak English so I remember asking

10  for help in Spanish.  I was crying because I was nervous.  I

11  didn't know what to do and then an agent who spoke Spanish came

12  over and then he explained a few things to me so I would call

13  Francisco.

14  Q    Well, let's back up for a second, what did you tell this

15  man initially when you met him at the precinct?

16  A    I told this man, this officer that I was in New York

17  because I had been forced into prostitution.  I was only 17 and

18  I was 14 when they brought me here.

19  Q    After you told him this, what happened then?

20  A    After this some other officers came over, they took me

21  into a room and we started talking and they asked me if I had

22  any belongings and I said yes.  So I took them to the apartment

23  of that Ecuadorian man, we picked up my things and they took me

24  to a hotel where I could be safe.

25  Q    You mentioned that this officer had asked you to contact

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

Delia - Direct/Argo

1    Francisco earlier; is that right?

2    A    Yes, that's correct.

3    Q    Did you do as he asked?

4    A    Yes, that's correct.

5    Q    What, if anything, did the officer tell you to say to

6    Francisco?

7    A    He told me to tell Francisco, say, hi.  I was to say I was

8    sick and in the hospital and I needed help and could I go back.

9    He said no because he wasn't in the apartment, he told me I

10   couldn't go back.

11   Q    Did you have any idea why you were speaking to Francisco

12   at this officer's direction?

13   A    I have no idea.

14   Q    You said that you'd taken some things from the apartment

15   and one of those was a computer?

16   A    That's correct.

17   Q    I'd like to show you what's been marked -- I'm sorry

18   what's in evidence as Government's Exhibit 874A through 874C.

19        What is this, Delia?

20   A    They're phone numbers.

21   Q    Were those numbers located or stored within the computer

22   that you had with you?

23   A    Yes.

24   Q    Let's start with 874A.  What's the first number that's

25   listed on this page?

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

861

Delia - Direct/Argo

1  A     The first line says, "boss revolution."  These were

2  prepaid calling cards that cost two to $5 and it's what we used

3  to call Mexico.

4  Q     Going another two lines down.

5  A     That's Benjie's phone number.

6  Q     Who is Benjie?

7  A     That's Benjamin.

8  Q     Moving down -- can I actually mark on the screen to show

9  you?

10        THE COURT:  I'm sorry.

11        MS. ARGO:  Does anyone know if I can mark on the

12  screen so the witness can see it?  Yes.

13        This phone number here, what does that say there, what

14  is the contact name?

15  A     It says "Jefa" and that's Francisco's mother's phone

16  number.

17  Q     Going down to this point here on the Government's

18  Exhibit 874A.

19  A     That's Memelas, he's Miguel.  That's his phone number.

20  Q     Is that the phone number for Miguel here in the U.S. or in

21  Mexico?

22  A     For Mexico.

23  Q     Moving down to this point here.  Do you recognize that

24  name?

25  A     Yes, that's Rosalio.  El Guacho.

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

Delia – Direct/Argo

1    Q    Is that a nickname for Rosalio?

2    A    Yes, that's correct, that's Rosalio's nickname.

3    Q    Let's turn to 874B.  With respect to this one here, what

4    is that?

5    A    That is Fabiola's number who they also called Chapparita

6    and she was also known as Lourdes and I called her auntie.

7    Q    Let's move back to Government's Exhibit 863 just for the

8    witness, if we could.  Do you recognize this person?

9    A    Yes, I do recognize her.

10   Q    Who is that?

11   A    That's Fabiola, who I called auntie and she was also

12   called Chapparita or Lourdes.

13            MS. ARGO:  At this time the government would move to

14   admit 863 in evidence.

15            THE COURT:  Admitted.

16            (Government Exhibit 863, was received in evidence.)

17            MS. ARGO:  Just publish to the jury please.

18            (Exhibit published.)

19   Q    You said her nickname was also Chapparita?

20   A    That's correct.

21   Q    Let's go back to Government's Exhibit 874B.  This next

22   number down from Chapparita, who is this?

23   A    That's Guacho, Rosalio.

24   Q    Is that number here in the United States or in Mexico, if

25   you know?

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

Delia - Direct/Argo

1    A    It's a number here in the United States.

2    Q    Let's move over to Government's Exhibit 874C and here, who

3    is this here?

4    A    That's Rosalio's phone number.

5    Q    This is a different phone number than the one we just

6    looked at?

7    A    It looks like.

8    Q    What is that number, can you read it out?

9    A    Yes, it's (347)570-3069.

10   Q    This number here.

11   A    That's the phone number for the person who sold condoms

12   calling them chocolates.

13   Q    And how about this one here.

14   A    That's Miguel's phone number in Mexico.

15   Q    Let's move to Government's Exhibit 853.  You mentioned

16   that you also left Francisco's apartment with a phone; is that

17   right?

18   A    That's correct.

19   Q    What do we see here in Government's Exhibit 853.

20   A    We are seeing that information for the phone that I took

21   with me.

22   Q    I'm going to direct your attention to page 12 of

23   Government's Exhibit 853, contact number 112.

24        Can you explain to the jury what this is?

25   A    That phone number, it's for Francisco's parents' house.

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

864

Delia – Direct/Argo

1    Q    Is that number are you referring to a number in Mexico?

2    A    Yes, that's correct.

3    Q    Directing your attention to page 64 of Government's

4    Exhibit 853, contact number 663.  Do you recognize that

5    contact?

6    A    Can you repeat which number it was please.

7    Q    Number 663.

8    A    I don't have it.

9         MS. ARGO:  I'm sorry, looks like my pages are looking

10   a little different than what's on the screen.  One moment I'll

11   just confirm.

12   Q    Sorry, it should be page 63.  Do you recognize this

13   contact?

14   A    Yes, I do recognize it.

15   Q    What do you recognize it to be?

16   A    That's Rosalio's phone number.  I forgot to mention

17   earlier that he was also called Leo and that's why this says

18   Leo T, for uncle, tio.

19   Q    On that same page there's contact number 666.  Do you

20   recognize this contact?

21   A    Yes.

22   Q    What do you recognize it to be?

23   A    The phone number for Rosalio's sister Guadalupe.

24   Q    Let's turn to the same Government's Exhibit 853, page 79,

25   contact number 730.  Do you recognize this contact?

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

Delia – Direct/Argo

1    A    Yes, I do recognize it.

2    Q    Who is this contact for?

3    A    This is a contact number for Fabiola, the one who has a

4    mark on her face, also known as Lourdes and Chapparita.

5    Q    Now I'm going to direct your attention to page 114 of this

6    contact list.  At the very bottom of the page 1203 is a name,

7    do you recognize the name?

8    A    Yes, Vero.

9    Q    Do you know who that's referring to?

10   A    It refers to Veronica.

11   Q    If we can move to page 115, at the top of the page with

12   the rest of the numbers up there.  The top of page, is that a

13   number here in the U.S. or in Mexico?

14   A    It's for here, in the United States.

15            MS. ARGO:  No further questions.

16            THE COURT:  Would you like a break?

17            MR. GOLD:  Five minutes, please.

18            THE COURT:  Okay, we'll take a short break.

19            THE COURTROOM DEPUTY:  All rise.

20            (Jury exits courtroom.)

21            (Recess.)

22            (In open court; jury not present.)

23            THE COURT:  Everybody's ready, right?

24            THE COURTROOM DEPUTY:  All rise.

25            (Jury enters courtroom.)

Delia – Cross/Gold

1          THE COURT:  Please be seated.  Mr. Gold.

2          MR. GOLD:  Thank you, Your Honor.

3    CROSS-EXAMINATION

4    BY MR. GOLD:

5    Q    You stated earlier today that there were occasions where

6    drivers refused to take you to work because you looked too

7    young, correct?

8    A    That's correct.

9    Q    And, in fact, you said that when you were first informed

10   that you were going to have to be a prostitute, Rosalio and

11   Francisco told you to dye your hair to make you look older.

12   That's yes or no.

13   A    Can you please repeat the question.

14   Q    Certainly.  You testified earlier today that Rosalio and

15   Francisco told you to dye your hair so you would look older

16   when you worked, correct?  With highlights I think you said.

17   A    Could you ask that question with different words please.

18   Q    When Ms. Argo questioned you earlier this morning I

19   believe she asked you whether Rosalio and Francisco did

20   anything to your hair to make you look older, do you recall

21   that?

22   A    Yes.

23   Q    Because if drivers didn't take you because you looked too

24   young, that's money out of Francisco's pocket, correct?

25   A    I don't know.

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

Delia - Cross/Gold

1   Q    Well, you turned over all the money you made in

2   prostitution to Francisco, correct?

3   A    Yes.

4   Q    And if drivers weren't taking you because you looked too

5   young, you weren't earning any money, correct?

6   A    However, there were drivers who did give me work.

7   Q    Thank you for telling us, but that wasn't my question.  My

8   question simply was, if you didn't work because drivers thought

9   you were too young, you weren't making money?

10  A    Yes, I wouldn't make money.

11  Q    And it's also your testimony that when Francisco was in

12  Mexico you spoke with him on the phone and you advised him that

13  you did not want to work anymore, correct?

14  A    That's correct.

15  Q    And he threatened that he would make your 12-year old

16  sister work for him as a prostitute as he made you work for him

17  as a 14-year old prostitute, correct?

18  A    Yes.

19  Q    And so even though he knew that drivers weren't taking you

20  because you looked too young, he was threatening to take your

21  even younger sister and force her to do prostitution as well,

22  is that your testimony?

23  A    Yes.  That's what he said to me.

24  Q    At the beginning of your testimony Ms. Argo asked whether

25  you saw anyone in the courtroom that you recognized.  Do you

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

Delia – Cross/Gold

1   remember that?

2   A    Yes, I do remember.

3   Q    At that time you identified each of the defendants at the

4   defense table, correct?

5   A    That's correct.

6   Q    And in fact, there were many other people in the courtroom

7   that you also recognized, correct?

8   A    I don't know what you're referring to with other people.

9   Q    The question Ms. Argo asked was whether you recognized

10  anyone in the courtroom and you identified each of the

11  defendants, correct?

12  A    That's correct.

13  Q    And what I'm asking you is, were there any other people in

14  the courtroom that you also recognized that you didn't identify

15  at that time?

16  A    Well, it took me sometime because that person was wearing

17  glasses.

18  Q    My question is not about your ability or inability to

19  identify somebody at the time you did, my question is other

20  than those people at the defense table who you identified, was

21  there anyone else in the courtroom that you recognized?

22  A    Yes.

23            (Continued on the next page.)

24

25

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

Delia - Cross/Gold

1      (In open court.)

2    CROSS-EXAMINATION

3    BY MR. GOLD (continuing):

4    Q    Who else did you recognize in the courtroom that you

5    didn't identify?

6    A    I'm sorry?

7    Q    Who else other than the defendants, seated at the defense

8    table, did you recognize when you entered the courtroom?

9    A    I recognize them.

10   Q    "Them" meaning the people seated at the government table,

11   correct?

12   A    Yes.

13   Q    Because you have met with them on many occasions prior to

14   your testimony, correct?

15   A    That's correct.

16   Q    You went over all the questions that Ms. Argo was going to

17   ask you, and you told her all the answers you were going to

18   give to those questions, correct?

19   A    Would you please ask me that question with different

20   words, please?

21   Q    Sure.  Before you testified -- I guess it was Thursday,

22   and today, you had previously gone over the questions with

23   Ms. Argo, that she planned to ask you, correct?

24   A    Yes.

25   Q    And you had gone over what answers you would give to those

MICHELE NARDONE, CSR -- Official Court Reporter

Delia – Cross/Gold

1    questions, correct?

2    A    I only told them what had happened.

3    Q    Thank you for telling us.

4         My question to you was:  Did you go over the answers

5    that you intended to give in response to her questions?

6    A    Yes.

7    Q    And in addition to speaking with Ms. Argo you also met,

8    over the course of the years since 2014, with -- I'm sorry, I

9    withdraw that.

10        Since 2014 you have had occasion to meet with several

11   representatives from the United States Government in connection

12   with this investigation, correct?

13   A    Yes.

14   Q    In fact, you met with many other representatives of the

15   government who are not present in court for this trial,

16   correct?

17   A    Could you please repeat your question?

18   Q    Certainly.  In addition to the people seated at the

19   government's table, over the course of the many years since

20   April of 2014 you have met with several other representatives

21   of the government, correct?

22   A    Yes.

23   Q    You met with the Mexican consular concerning the events

24   that occurred to you that have been the subject of your

25   testimony, correct?

MICHELE NARDONE, CSR -- Official Court Reporter

Delia – Cross/Gold

1    A      Yes.

2    Q      You were willing to testify before a United States Senate

3    Judiciary Committee with Senator Lindsey Graham, right?

4    A      No.

5    Q      You weren't asked to testify before the United States

6    Senate?

7    A      I never testified, no.

8    Q      My question is:  Were you asked if you would be willing to

9    testify?

10   A      I was asked, but I said no, I couldn't do it.

11   Q      So over the years you have had many occasions in which you

12   sat down with various authorities and told them what happened

13   to you, correct?

14   A      That's correct.

15   Q      During the course of these many occasions when you met

16   with the government did you ever review any prior statements

17   that you might have given them?

18              (Witness ran out of the courtroom.)

19              THE COURT:  Why don't we take another break, ladies

20   and gentlemen.

21              (Jury exits.)

22              (Continued on the next page.)

23

24

25

MICHELE NARDONE, CSR -- Official Court Reporter

Delia – Cross/Gold

1          THE COURT:  You might want to take this opportunity to

2     sit down.

3          MR. GOLD:  I'm sorry?

4          THE COURT:  You might want to take this opportunity to

5     sit down.

6          MR. GOLD:  I appreciate it.  Thank you.

7          (Witness enters courtroom.)

8          THE COURT:  Are you sure you are ready to proceed?

9          THE WITNESS:  (In English) I'm sorry.  I couldn't

10    breathe.  I needed to take fresh air.

11         THE COURT:  You need fresh air?

12         THE WITNESS:  Yes.  That's why I ran away.

13         THE COURT:  Because you couldn't breathe?

14         THE WITNESS:  No.  It's just that when I drink water I

15    couldn't breathe, and that's why I ran, because I couldn't

16    breathe at all.  I'm sorry.

17         THE COURT:  All right.  So I guess we can proceed.

18         (Pause.)

19         (Continued on the next page.)

20

21

22

23

24

25

MICHELE NARDONE, CSR –– Official Court Reporter

1          THE CLERK:  All rise.

2          (Jury enters.)

3          THE COURT:  Please be seated.

4          Mr. Gold.

5          MR. GOLD:  Thank you.

6   BY MR. GOLD:

7   Q    (Through the interpreter) So would you agree that since

8   April of 2014 you have had occasion to discuss the substance of

9   your testimony with many officials from the United States

10  Government, correct?

11  A    That's correct.

12  Q    Now, prior to your testimony did you go over questions

13  that you might be asked on cross-examination, like I'm asking

14  you now?

15  A    Yes.

16  Q    I didn't go over my questions with you though, correct?

17  A    No.

18  Q    By the way, since Thursday evening when we broke until

19  this morning, when you resumed the stand, did anyone offer you

20  any advice or criticism about your testimony?

21  A    No.

22  Q    Going back for a moment to the threat about having your

23  12-year-old sister forced -- be forced to work as a prostitute,

24  did Francisco tell you how he was going to get your 12-year-old

25  sister into the United States?

MICHELE NARDONE, CSR -- Official Court Reporter

Delia – Cross/Gold

1    A    No.

2    Q    Was he going to kidnap her?

3    A    I don't know.

4    Q    How did you imagine he was going to get your 12-year-old

5    sister in the United States and work for him as a prostitute?

6    A    I don't know that.

7    Q    Where were you living when you first met Francisco?

8    A    I was living in Puebla.

9    Q    Were you with your family or in an apartment?

10    A    I was living with my family.

11    Q    Now, you indicated that your home life prior to meeting

12    Francisco, that your home life was pretty awful, correct?

13    A    That's correct.

14    Q    You had been raped by your father and by your uncle?

15    A    That's correct.

16    Q    And, in fact, you ran away from them?

17    A    Yes.

18    Q    And approximately three days after you ran away the police

19    returned you to your family home, correct?

20    A    That's correct.

21    Q    So by the time you met Francisco and he asked you to move

22    in with him you were pretty happy to do so, weren't you?

23    A    Yes.

24    Q    And you fell in love with him?

25    A    Yes.

MICHELE NARDONE, CSR -- Official Court Reporter

Delia – Cross/Gold

1   Q    And he fell -- you thought he fell in love with you?

2   A    That's correct.

3   Q    Now, at any time prior, before, you came to America with

4   him, at any time before then had he ever threatened you?

5   A    He did not threaten me during that time.

6   Q    In fact, it was your testimony that he was treating you

7   well, while you were still in Mexico, correct?

8   A    That's correct.

9   Q    Were you forced in any way to come here?

10  A    No.

11  Q    You were happy to leave Mexico with him, correct?

12  A    Because he promised me that I would have a better life,

13  yes.

14  Q    And you believed him?

15  A    That's correct, I did believe him.

16  Q    Now, the very first night you spent when you went back

17  with him to his family, he raped you, didn't he?

18  A    Well, we had sex that night, but he did something that I

19  didn't want.

20  Q    And you told him you didn't want?

21  A    Yes, that's correct.

22  Q    And he forced you to do?

23  A    Exactly.

24  Q    That's rape, isn't it?

25  A    Yes.

MICHELE NARDONE, CSR -- Official Court Reporter

Delia - Cross/Gold

1   Q    And after the first night that he raped you, the following

2   morning did you go to his mother and say, hey, your son just

3   raped me?

4   A    I didn't say anything to her.

5   Q    In fact, you didn't say anything to anybody, did you?

6   A    Who was I going to tell?  I didn't tell anybody then.

7   Q    Were there any -- I don't remember -- there were pictures

8   you were shown of various family houses.

9         Were there any neighboring houses to those, of the

10  family you have described?

11  A    Could you repeat your question one more time, please?

12  Q    Sure.  Were there any houses nearby where Francisco's

13  family house was?

14  A    Yes, there were nearby houses.

15  Q    Did you run out into the street screaming, arrest this

16  man, he raped me?

17  A    At the time I didn't know that forcing somebody to have

18  anal sex meant raping that person.

19  Q    Didn't you just agree with me about five minutes ago that

20  he raped you?

21  A    Yes, but I really didn't know then.

22  Q    At the time your father and your uncle raped you, did you

23  know you were raped then?

24  A    I didn't know that.

25  Q    But after they raped you, you ran away from them, correct?

MICHELE NARDONE, CSR -- Official Court Reporter

877

Delia - Cross/Gold

1   A   And I had to go back to the house, that's correct.

2   Q   But you ran away from them, correct?

3   A   Yes.

4   Q   And after Francisco raped you, you ran to America with

5   him, correct?

6   A   I was in love with Francisco.

7   Q   Now, when you crossed the border you did so in violation

8   of United States law, correct?

9   A   I'm not familiar with United States laws.

10  Q   So you thought it was perfectly normal and legal that you

11  walked around in the desert for however many days until

12  Immigration and Border Patrol caught you?

13  A   As I said before, I'm not familiar with the laws here.

14  Q   So did you think everybody who traveled from Mexico to

15  America went with coyotes into the desert for three days

16  without food and water before crossing?

17  A   Can you repeat the question, please?

18  Q   I will withdraw the question.

19      Did you think everyone who came to America from Mexico

20  was instructed to give phoney dates of birth, if asked?

21  A   I don't know that.

22  Q   So when you were instructed prior to trying to illegally

23  cross into the United States to give a phoney birth date, you

24  thought that was perfectly normal?

25  A   I was just following Francisco's instructions and his aunt

MICHELE NARDONE, CSR -- Official Court Reporter

878

Delia – Cross/Gold

1    Guadalupe's instructions at that time.

2    Q    Crossing the border the way you did and being instructed

3    not to give your true birth date, that didn't give you any idea

4    that what you were doing was illegal?

5    A    At that time I didn't know the laws.

6    Q    And prior to crossing had Francisco given you phoney

7    identification?

8    A    Well, they took me to city hall in Tenancingo to get an

9    ID.

10   Q    And did that ID have your true name and date of birth?

11   A    Right now I don't remember what information it had on it.

12   Q    Do you remember ever telling representatives of the

13   government that he gave you phoney identification papers to use

14   at the crossing in case you were caught?

15   A    Well, at that time not even the authorities did not even

16   get an authorization from my parents to go out of the country.

17   A minor is not able to get an ID until they are 18.

18        MR. GOLD:  Could the reporter please repeat my last

19   question.

20        (Record read.)

21   Q    Could you please answer that question.

22   A    I can't give you an answer to that question because I

23   don't know.

24   Q    Okay.  Part of the instructions that you got from

25   Guadalupe and Francisco before crossing was that in case you

MICHELE NARDONE, CSR –– Official Court Reporter

Delia - Cross/Gold

1    were stopped, give them a birth date that showed you were older

2    and not a minor, or words to that effect, correct?

3    A    I was only following both of their instructions.

4    Q    Thank you for that.  My question is -- withdrawn.

5         MR. GOLD:  Could the reporter please read back the

6    question.

7         (Record read.)

8    Q    Now, will you please answer that question?

9    A    At the time I was just following their instructions, and

10   both of them told me that since I had made a mistake previously

11   Guadalupe was going to answer for me.

12   Q    If you don't understand my question, please let me know.

13   Ms. Argo asked you the same question this morning.

14        Quite simply:  Were you instructed by Guadalupe and

15   Francisco to use an older birth date, if stopped by border

16   control agents?

17   A    Yes.

18   Q    In fact, there did come a time on July 18, 2010 you were

19   stopped by the border patrol, correct?

20   A    That's correct.

21   Q    And when you were stopped you gave a birth date of May 3,

22   1995, correct?

23   A    I don't remember.

24        MR. GOLD:  Your Honor, may I just show something to

25   the witness?

MICHELE NARDONE, CSR -- Official Court Reporter

Delia – Cross/Gold

1          THE COURT:  Yes.  Just do it on the ELMO.

2          MR. GOLD:  Yes, that's what I was intending on doing.

3    I just didn't want it broadcast.

4          THE COURT:  That's fine.

5    Q    Can you see what's on this document?

6    A    Yes.

7    Q    I ask you to look -- now, if I point on this, I think you

8    can see it.

9          Can you see, on the fifth line down, it indicates date

10   of birth?  Do you see that?

11   A    Yes, I can see the date of birth on there.

12   Q    And does it refresh your recollection that when you were

13   stopped on July 18, 2010, the date of birth that you gave was

14   May 3, 1995?

15   A    I don't remember that.

16   Q    Then on July 22 you were stopped again by border patrol,

17   correct?

18   A    That's correct.

19   Q    And on that occasion do you recall giving your birth date

20   as March 3, 1995?

21   A    I don't remember that.

22   Q    Were you questioned by a border agent when you were

23   stopped on July 18?  Let's start there.

24   A    Yes.  I was arrested.

25   Q    Did you speak with agents, giving -- who asked you your

Delia – Cross/Gold

1    name, your date of birth, where you lived, things to that

2    effect?

3    A    I don't remember.

4    Q    Similarly, when you were stopped on July 22, 2010, the

5    same procedure unfolded, with the agent asking you questions

6    and you giving answers; is that correct?

7    A    As I said before, Guadalupe was the one who was answering

8    for me.  There are things that I don't remember.

9            MR. GOLD:  May I have a moment, Your Honor?

10           THE COURT:  Yes.

11           (Pause.)

12           MR. GOLD:  Your Honor, without objection, I offer as,

13   I guess, Defense Exhibits 1 and 2 what's marked as 3500-Delia-2

14   and 3, offered in evidence.  I would like to publish it to the

15   jury.

16           THE COURT:  Any objection?

17           MS. ARGO:  No objection, Your Honor.

18           THE COURT:  Admitted.

19           (Defense Exhibits 1 and 2 so marked.)

20           (Published.)

21   BY MR. GOLD:

22   Q    Now, you have indicated that you don't recall what you

23   told the border agents specifically, in connection with your

24   date of birth, correct?

25   A    That's correct.  A long time has gone by.  I don't know.

MICHELE NARDONE, CSR -- Official Court Reporter

882

Delia – Cross/Gold

1   Q    And you also indicated that Guadalupe answered some

2   questions for you.  Did I hear that correctly?

3   A    That's correct.

4   Q    Whether it was you or whether it was Guadalupe, whoever

5   told the immigration officer your birth date, gave a birth date

6   on both occasions when you were still a minor, correct?

7   A    Yes.  That's what I seen right here right now, in the

8   documents that you just showed.

9   Q    So Guadalupe and Francisco didn't follow their own

10  instructions to you about giving a date of birth that showed

11  you were an adult?

12  A    I don't know that.

13  Q    Well, they told you to say you were an adult if you were

14  caught, correct?

15  A    That's correct.

16  Q    And you didn't say you were an adult, you said you were 15

17  years old, correct?

18          MS. ARGO:  Objection, Your Honor.

19          THE COURT:  Sustained.

20  Q    The documents that are in evidence show that you were 15

21  years of age?

22          MS. ARGO:  Objection, Your Honor.

23          THE COURT:  Sustained.

24  Q    What is your real birthday?

25  A    May 3rd.

MICHELE NARDONE, CSR –– Official Court Reporter

Delia – Cross/Gold

1    Q    What year?

2    A    1996.

3    Q    Did anyone -- withdrawn.

4         Did Francisco threaten you or hit you for not using an

5    older birth date?

6    A    No.

7    Q    Now, when you came here, I believe you indicated that you

8    had no idea how you were going to make a living, correct?

9    A    That's correct.

10   Q    And you didn't know what Francisco was going to do to make

11   money, correct?

12   A    Correct.

13   Q    And would it be fair to say that when you crossed the

14   border you came with no clothes other than what you were

15   wearing?

16   A    Can you repeat the question?

17   Q    Did you have any other clothes with you when you illegally

18   crossed the border, other than what you were wearing?

19   A    No.

20   Q    And you had no money?

21   A    No, I didn't have any money.

22   Q    Now, Francisco had told you that you were using coyotes to

23   help you illegally cross the border, correct?

24   A    Yes.

25   Q    And you had to pay them $11,000 for the two of you to

MICHELE NARDONE, CSR -- Official Court Reporter

Delia - Cross/Gold

1    cross, correct?

2    A    I don't remember right now how much had to be paid.

3         MR. GOLD:  I'm sorry, Your Honor.  I'm just looking

4    for something.

5         (Pause.)

6         MR. GOLD:  I will look for it later.

7    Q    When you got here Francisco told you, you would have to

8    work as a prostitute, correct?

9    A    Yes.

10   Q    And he told you that you had to do so in order to pay off

11   the smuggler's fee, correct?

12   A    Well, he used some threatening words so I would do that.

13   I had no other option.  So I ended up agreeing.

14        MR. GOLD:  Yes, you have told us that.

15        Will the reporter please repeat my last question.

16        (Record read.)

17   Q    Please answer that question.

18   A    Yes.

19   Q    And you told him you had no interest or desire in working

20   as a prostitute, correct?

21   A    That's correct.

22   Q    And, as you said, he threatened you, correct?

23   A    That's correct.

24   Q    And he told you if you went to the police to complain they

25   would deport you, correct?

MICHELE NARDONE, CSR -- Official Court Reporter

Delia - Cross/Gold

1   A     That's correct.

2   Q     This made you very angry, didn't it?

3   A     Yes.

4   Q     At that time you thought he loved you, and you loved him,

5   correct?

6   A     Yes, I was in love with him.

7   Q     And now you saw he was a monster?

8   A     There were times when he treated me well, and then he

9   wouldn't.

10  Q     I'm speaking about this very first conversation you had

11  with him, when you arrived in Queens and he told you, you had

12  to be a prostitute.

13        At that moment did you realize and think to yourself,

14  this man that I love is a monster?

15  A     Yes.

16  Q     But you didn't go to the police, didn't you?

17  A     No, I didn't.

18  Q     And you didn't go to the Mexican consulate here in

19  New York, did you?

20  A     I didn't know where I was.  I didn't know where I was

21  living.  I didn't know how to get there.  I didn't even know

22  where I was living.

23  Q     How many days after this conversation did you start

24  working as a prostitute?

25  A     On approximately the third day.

MICHELE NARDONE, CSR -- Official Court Reporter

Delia – Cross/Gold

1    Q    And on that third day you were taken by a delivery driver,

2    I believe you said.

3    A    Yes.

4    Q    When you left the house and went towards where you were

5    meeting the delivery driver, at any point did you just keep

6    running and screaming, this man is making me be a prostitute?

7    A    I was afraid.  I was afraid he would kill my family.

8    That's why I didn't say anything.  I didn't know what to do.

9    Q    While you lived in the apartment you met somebody called

10   Fabiola, whose last name begins with a C, I believe, not the

11   one with the scar on her face; is that right?

12   A    Could you please repeat your question.

13   Q    While you were living in the apartment in Queens did you

14   meet a woman named Fabiola, not the one with the scar, whose

15   last name I believe starts with the letter C?

16   A    Yes, I met her.

17   Q    Do you remember what name you gave her when you introduced

18   yourself?

19   A    I don't remember.

20   Q    You told her your name was Katherine, not Delia, correct?

21   A    I don't remember having said -- I don't remember what I

22   said.

23   Q    Do you remember telling her you were 19 years old, not 14?

24   A    I don't remember that.

25   Q    And you recall testifying earlier about meeting another

MICHELE NARDONE, CSR -- Official Court Reporter

Delia - Cross/Gold

1   woman named Veronica, you remember her, correct?

2   A    Yes.

3   Q    And do you remember introducing yourself to Veronica by

4   the name Katherine, not Delia?

5   A    I don't remember that.

6   Q    Do you remember how old you told Veronica you were?

7   A    I don't remember that.

8   Q    Now, in both of the cases of Veronica and Fabiola C, they

9   spoke Spanish, correct?

10  A    Yes.

11  Q    And you had no trouble communicating with them, correct?

12  A    No.

13  Q    And you never told either of them to please help you

14  escape because you are only 14 and they are making you be a

15  prostitute?

16  A    They were also working in prostitution.

17         MR. GOLD:  My question -- withdrawn.

18         Will the reporter please read back my question.

19         (Record read.)

20  A    I didn't feel -- I didn't know what to do.  I was afraid

21  because Francisco had threatened to kill my family.

22  Q    And you were 14?

23  A    And I was 14, yes.

24         MR. GOLD:  Your Honor, can we get like a two-minute

25  break, please?

MICHELE NARDONE, CSR -- Official Court Reporter

Delia – Cross/Gold

1        THE COURT:  Yes.

2        MR. GOLD:  Thank you.

3        THE CLERK:  All rise.

4        (Jury exits.)

5        THE COURT:  Please be seated.  Just let us know when

6   you are ready to start.

7        MR. GOLD:  Give me a minute, judge.

8        THE COURT:  That's okay.

9        (Recess.)

10        THE COURT:  I gather that Dennis did send the medical

11   e-mail to MDC.

12        MR GOLUB:  I see that and told my client.  Thank you.

13        (Pause.)

14        THE CLERK:  All rise.

15        (Jury enters.)

16        THE COURT:  Please be seated.

17        Mr. Gold.

18        MR. GOLD:  Thank you, Your Honor.

19   BY MR. GOLD:

20   Q    I would just like to briefly go back for a moment.

21   Earlier you indicated that you couldn't recall how much the

22   coyotes' fees were for you and Francisco, correct?

23   A    That's correct.

24   Q    Do you recall going to the police somewhere in and around

25   April 25, 2014?

MICHELE NARDONE, CSR –– Official Court Reporter

Delia – Cross/Gold

1    A    Yes.

2         MR. GOLD:  Your Honor, may I show something just to

3    the witness?

4         THE COURT:  Yes.

5    Q    Can you see that, ma'am?

6    A    Yes.

7    Q    I direct your attention to the line marked in orange and

8    ask you if it refreshes your recollection that the fee for the

9    smugglers and the van to come to New York from Mexico was

10   $11,000?

11   A    I don't remember that.  I don't remember.

12   Q    Would you agree that your memory in April of 2014 about

13   the events you have testified was fresher than your memory is

14   today?

15        MS. ARGO:  Objection, Your Honor.

16        THE COURT:  Sustained.

17        Don't answer the question.

18   Q    Now, how much did you generally earn per shift?

19   A    It would depend on how many clients I had, maybe 800, 700.

20   Q    Was that the amount that you took back, or is that the

21   total that had to be split with the driver?

22   A    That was the amount I took home with me.

23   Q    You have described working conditions that are horrific,

24   to say the least.

25        Would you agree?

MICHELE NARDONE, CSR -- Official Court Reporter

Delia – Cross/Gold

1   A    Yes.

2   Q    You had someone pull a gun on you?

3   A    I don't remember that right now.

4   Q    You don't remember ever telling an agent that a client

5   pulled a gun on you?

6   A    It's been a long time.

7   Q    Okay.  But I believe you did testify you recall a client

8   stabbing you with a knife, correct?

9   A    Yes.

10  Q    And on one occasion you were hit with a pipe?

11  A    That was with a pipe in a closet.

12          MR. GOLD:  I'm sorry?  I didn't hear.

13          THE INTERPRETER:  "That was with a pipe in a closet."

14          MR. GOLD:  Okay.

15  Q    So would you agree that you were hit and hurt on a regular

16  basis?

17  A    Could you please repeat your question.

18  Q    You were hit or hurt by clients on a fairly frequent

19  basis, weren't you?

20  A    Yes.

21  Q    On those occasions Francisco wouldn't let you go to a

22  doctor or take time off, did he?

23  A    Correct.

24  Q    And when you told him you wanted to go to the police and

25  report these people who did this to you, he told you you

MICHELE NARDONE, CSR -- Official Court Reporter

891

Sidebar

1    couldn't because you would be deported, correct?

2    A    I don't know where you got that from.  I don't remember

3    having said that.

4    Q    On one occasion you were beaten so badly somebody called

5    911, and the police came, correct?

6    A    That's correct.

7    Q    Instead of waiting for the police to report the person who

8    had injured you, you ran away, correct?

9    A    That day I called Francisco, and he gave me instructions

10   to run and not let myself get arrested by the police.

11   Q    Because if you got arrested you would also be deported,

12   correct?

13   A    Yes.  It's what he implied, what Francisco implied.

14   Q    So instead of telling the police what your life was, you

15   continued to be subject to those injuries and harm rather than

16   be deported back to Mexico?

17   A    I was scared.  I spoke Spanish.  I didn't speak any

18   English.  I didn't know anything.

19           THE COURT:  Could we just speak at sidebar for a

20   moment.

21           MR. GOLD:  Sure.

22           (Continued on the next page.)

23

24

25

MICHELE NARDONE, CSR -- Official Court Reporter

Delia – Cross/Gold

1          (Sidebar conference.)

2          THE COURT:  I understand the line of cross-examination

3    you are pursuing, but you have been pursuing it for a very long

4    time.

5          MR. GOLD:  Okay.  I will move on.  Simple.  I'm easy.

6          THE COURT:  Okay.

7          (End of sidebar conference.)

8          (Continued on the next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MICHELE NARDONE, CSR –– Official Court Reporter

893

Delia -- Cross/Gold

1        (In open court.)

2   BY MR. GOLD:

3   Q    In December of 2011 Francisco returned to Mexico, correct?

4   A    Correct.

5   Q    And that's when he threatened you concerning your sister,

6   correct?

7   A    Correct.

8   Q    How often did you speak to him while he was in Mexico?

9   A    Almost every day.

10  Q    And would it be fair to say that almost every day he

11  complained to you that you weren't sending enough money,

12  correct?

13  A    Yes.

14  Q    Even though he threatened you and complained about not

15  sending enough money, instead of working seven days you started

16  working five, correct?

17  A    I remember working fewer days -- I mean fewer hours.

18  Q    Despite the threats and the complaints you stopped taking

19  calls from drivers during this period, didn't you?

20  A    I started working less.

21  Q    Thank you.

22        My question is:  Did you stop taking calls from

23  drivers?

24  A    No.  I continued working.  The only thing is that instead

25  of working two shifts I was working one shift.

MICHELE NARDONE, CSR -- Official Court Reporter

Delia – Cross/Gold

1   Q    Instead of working, didn't you go visit Veronica instead?

2   A    I don't remember.

3   Q    Now, during the time period from December through May

4   of -- December of 2011 to May of 2012, you were sending

5   Francisco approximately $400 a week; is that correct?

6   A    I don't know that.  I don't remember that.

7        MR. GOLD:  Your Honor, may I show something just to

8   the witness?

9        THE COURT:  Yes.

10        MR. GOLD:  Can you read that?

11        MR GOLUB:  I can't read it.

12        THE COURT:  Yes.

13        MR. GOLD:  There we go.

14   Q    Now, can you see it now?

15   A    So-so.

16   Q    Can you see the paragraph with highlighted yellow

17   highlighter on it?

18   A    Yes.

19   Q    I ask you if that refreshes your recollection that during

20   the time period of May -- of December 2011 to May 2012 you

21   turned off your phone and stopped accepting calls from the

22   driver?

23   A    I don't remember that.

24   Q    Reading that same paragraph, does it refresh your

25   recollection that in fact you were sending $400 a week during

MICHELE NARDONE, CSR -- Official Court Reporter

Delia – Cross/Gold

1    that same time period?

2    A    I don't remember that.

3    Q    When you spoke to agents they would take notes of what you

4    said, correct?

5    A    Correct.

6    Q    And it was important to you that you gave them correct

7    information, wasn't it?

8    A    Yes.

9    Q    And if they wrote down the information that I just asked

10   you about, did they get that wrong?

11          MS. ARGO:  Objection.

12          THE COURT:  Sustained.

13          (Continued on the next page.)

14

15

16

17

18

19

20

21

22

23

24

25

Delia – Cross/Gold

1        (In open court.)

2    CROSS-EXAMINATION

3    BY MR. GOLD (continuing):

4    Q    Where did you wire the money to Francisco while he was in

5    Mexico?

6    A    I sent it to different places and I also had instructions

7    to use different names and not just mine.

8    Q    And you sent it from a place called Vigo; is that right?

9    A    I don't remember that.

10   Q    And Delgado Travel, did you send money from there?

11   A    I don't remember that.

12   Q    And at Francisco's direction did you send money to Ma Ana

13   Perez Rojas?

14   A    That's correct.

15   Q    And did you send money to -- again, talking about the time

16   period from May -- sorry, December 2011 through May 2012, did

17   you also send money during that time to Magdaleno

18   Melendez-Rojas?

19   A    Yes.

20   Q    And did you finally also send money to Maribel

21   Melendez-Perez during that time period.

22   A    I send money to names, different names of different

23   people, I don't remember exactly.

24   Q    I was asking if you remembered sending it to these

25   particular people?

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

Delia - Cross/Gold

1    A    Yes.

2    Q    And during this time frame can you recall any other names

3    of people you sent money to?

4    A    I don't remember that.

5    Q    Do you remember how much you sent from May of 2011

6    until -- withdrawn -- from December 2011 until May of 2012?

7    A    I don't remember that.

8    Q    How often would you send money?

9    A    I don't remember that.

10   Q    You indicated that while Francisco was in Mexico he

11   visited your parents, correct?

12   A    That's correct.

13   Q    And your mother cooked meals for him?

14   A    I don't remember that.  I don't know that.

15   Q    Now you left in April of 2014, correct?

16   A    Correct.

17   Q    Before that final time, had you attempted to leave a month

18   before then?

19   A    I don't remember that.

20   Q    And when you finally left, this was years after you and

21   your family had been threatened by Francisco, correct?

22   A    Could you please repeat the question using different

23   words, please.

24   Q    Sure.  By the time you went to the police in April of

25   2014, you had been threatened repeatedly by Francisco as to

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

Delia – Cross/Gold

1  what he would do to you or your family if you ever turned on

2  him?

3  A    I'm a little unfocused, can you repeat the question

4  please.

5  Q    In April of 2014 you went to the police, correct?

6  A    That's correct.

7  Q    From the time you first arrived in October of 2010 until

8  you finally went to the police, you had been threatened

9  repeatedly by Francisco, correct?

10 A    Correct.

11 Q    And you stayed working as a prostitute for all those years

12 because of the fear you had as to what he would do to you or

13 your family, correct?

14 A    That's correct.

15 Q    And when you met with the police and with Homeland

16 Security agents they asked you to cooperate with them in an

17 investigation, correct?

18 A    No.

19 Q    They didn't want you to tell them what happened?

20 A    It was me who wanted to cooperate with the authorities so

21 that Francisco could stop hurting other young women like me.

22 Q    Fine.  And did you tell them that you were willing and

23 anxious to cooperate with them for the reasons you've given,

24 but you were afraid for your family's safety back in Mexico and

25 you needed their protection?

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

Delia – Cross/Gold

1  A    Could you be so kind please to ask me that question with

2  using different words.

3  Q    Certainly.

4          THE COURT:  I think just cutting -- making them

5  shorter is going to make it easier.

6  Q    When you told the police and Homeland Security what had

7  happened to you, did you tell them that they had to protect

8  your family?

9  A    I don't remember if I did.

10 Q    You communicated by Facebook and email with friends back

11 in Mexico, correct?

12 A    I don't remember that.

13 Q    You don't remember ever communicating with anybody back

14 home while you were here working as a prostitute?

15 A    I don't remember that.

16 Q    Didn't you video chat with your mom on Facebook?

17 A    I don't remember that.

18 Q    Did you have email accounts that Francisco was unaware of

19 that you used to communicate with friends back in Mexico?

20 A    I don't remember that.

21 Q    When was the last time you were in Mexico, by the way?

22 A    I was in Mexico for the last time in 2010.

23 Q    At any time when you were working as a prostitute against

24 your will, did you ever tell anyone in Mexico what you were

25 being forced to do?

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

900

Delia - Cross/Gold

1   A    I don't remember that.

2   Q    During the time you were being forced to work as a

3   prostitute by Francisco, did you go to bars with him?

4   A    I don't know what you mean by that question.

5   Q    Do you know what a bar is?  They serve alcohol and food.

6   A    No.

7   Q    You never went to a bar on Roosevelt and 111th in Queens

8   with Francisco?

9   A    I don't remember that.

10   Q    Did you go to a pool hall with Francisco?

11   A    No.

12   Q    You don't recall ever telling agents of Homeland Security

13   that you used to go to a pool hall with Francisco to play pool?

14   You know what pool is?

15   A    I don't know what pool is.

16   Q    And you socialized with friends with Francisco, correct?

17   A    I don't remember that.

18   Q    Do you remember Margoli or Jacolo or Marisol or Wilmer?

19   A    I just remember Marisol and Wilber.

20   Q    Were you ever at their house?

21   A    I don't remember that.

22   Q    And you indicated that Francisco threw you birthday

23   parties I think when you were 15 and 16 or maybe I have the

24   years wrong -- withdrawn.  I'm sorry.  You testified earlier

25   today that Francisco threw birthday parties for you, correct?

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

Delia - Cross/Gold

1   A    That's correct.

2   Q    And on his birthday one time you made him a special

3   lobster dinner, do you recall?

4   A    I don't remember that.

5   Q    You went to New Year's parties with him, correct?

6   A    I don't remember that.

7   Q    Did you go to Rockefeller Center with him on New Year's?

8   A    I don't remember that.

9   Q    You went dancing together with him, correct?

10  A    No.

11  Q    And when you would go on -- withdrawn.  You went to the

12  beach with him as well, correct?

13  A    Yes.

14  Q    Ms. Argo showed you a bunch of pictures earlier this

15  morning, you recall seeing those pictures?

16  A    Yes.

17  Q    And at many of these types of social occasions you took

18  pictures, correct?

19  A    Yes.

20  Q    You had pictures on your phone and on your computer with

21  him, correct?

22  A    Francisco and I had access to that computer.

23  Q    Thank you for that.

24       MR. GOLD:  Would the reporter please read back my

25  question.

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

Delia – Cross/Gold

1          (Record read.)

2     A     Yes.

3     Q     Now I believe earlier today you stated that Francisco

4     started punching you in the face in the summer of 2013; is that

5     correct?

6     A     Francisco started hitting me in 2014 but I don't really

7     remember those events -- in '13.

8     Q     Now I'd like to show you and publish to the jury what's

9     been marked as Exhibit 1 for the Defense A through H and ask

10    you if you recognize these photos.  These are in without

11    objection I believe.

12          Do you see that picture?

13    A     Yes.

14    Q     Did anyone make you get on Francisco's shoulders?

15    A     Well, Francisco was the one who carried me and I remember

16    being nervous.

17    Q     Did he force you to get on his shoulders?

18    A     Well, that day he wanted to carry me and I was nervous.

19    Q     Is that why you were smiling because you were nervous?

20    A     That is correct.  When I get nervous sometimes I laugh and

21    I have to control myself.

22    Q     I show you what's marked I think as B.  Were you nervous

23    in this picture?

24    A     I was nervous while he had me there.

25    Q     You weren't having fun?

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

Delia – Cross/Gold

```
 1  A    He was carrying me.  I don't like to be carried.  It was

 2  making me nervous.

 3  Q    And I show you 1C --

 4       MR. GOLUB:  Make it smaller so you can see the whole

 5  thing.

 6       MR. GOLD:  You've got to be kidding me.  Thank you.

 7  Q    Do you see that picture?

 8  A    Yes.

 9  Q    You're smiling in that picture?

10  A    I don't look like I'm smiling.

11  Q    Okay.  What do you look like you're doing?

12  A    Francisco's carrying me there.

13  Q    I show you 1E.  You're not on his shoulders in this one,

14  right?

15  A    That's correct.

16  Q    So you're not nervous because you're on his shoulders,

17  right?

18  A    Exactly.

19  Q    And you're smiling in this photo too, correct?

20  A    Well, I don't see that my face is like this, no.  I'm

21  happy.  I'm --

22  Q    Because you were having fun, right, you're at the beach?

23  A    I'm not happy there.

24  Q    Sorry.  Finished?

25  A    Yes.  I just wanted to say that I wasn't happy in this
```

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

Delia - Cross/Gold

1    photo.  I was not happy.

2    Q    You were not happy, okay.

3          This is -- were you happy in this photo or is this the

4    same one I just showed you?  I apologize, it's the same one.

5    Sorry.

6          I show you 1D, were you happy in this photo?

7    A    No.

8    Q    Is there any photo that you've just seen in which you were

9    happy?

10   A    Not that I remember.

11   Q    Okay.  I show you now marked as 2F in evidence.  Do you

12   remember when this photograph was taken?

13   A    No.

14   Q    Well, this was taken on October 30th, 2013, right before

15   Halloween.  Do you recall that now?

16   A    No.

17   Q    No, you don't remember, or no, it's not at Halloween?

18   A    I don't remember when the photo was taken.

19   Q    Do you remember going to a Halloween party with Francisco?

20   A    No, I don't remember.

21   Q    Just one last question, were you happy in this photo?

22   A    No.

23   Q    I show you what's been marked as 2B in evidence also from

24   10/30/13.  Do you recognize that photo?

25   A    I see that I'm in it.

Delia - Cross/Gold

1    Q    You don't remember when this was taken?

2    A    No.

3    Q    Do you see in the photo you're carrying something in your

4    right hand?

5    A    Yes.

6    Q    Do you know what that is?

7    A    No, I don't remember what it is.

8    Q    It's not a bottle of champagne?

9    A    I don't know that.

10   Q    Were you happy in this photo?

11   A    I don't know.

12   Q    Who else -- if you could, identify for us please who the

13   other people are in this photo?

14   A    Abel's sister Alicia is there.

15   Q    That's it?

16   A    Yes, because I can't see the other people's faces.

17   Q    Okay, I show you what's marked as 2C.  Do you recognize

18   this photo from the Halloween party?

19   A    No, I don't remember it.

20   Q    Do you know who these people are in this photograph?

21   A    Yes.

22   Q    Can you please identify them for us?  How about starting

23   from left to right on the screen, the person in the black

24   outfit on the left?

25   A    The one who is wearing the black dress I don't remember

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

Sidebar

1   her name.

2   Q    Was she a prostitute?

3   A    Yes.  Then there is Alicia.  The third one is Fabiola.

4   Then the fourth one is me.  And the fifth one is Marisol with

5   her son.

6   Q    I'm sorry, the fifth one is?

7   A    The fifth one is Marisol with her son.

8   Q    What is that outfit you're wearing, by the way?

9   A    I don't know.

10  Q    Were you happy in this photograph?

11  A    No.

12  Q    And, finally, from the Halloween party, 2D.  Are you

13  smiling in that photograph?

14  A    No.

15  Q    All right.  So you weren't happy in this photo either,

16  correct?

17  A    That's correct.

18  Q    Now all these photos I'm showing you, these are photos you

19  turned over to the government, aren't they?

20  A    I don't remember that.

21          MS. ARGO:  Your Honor, could we have just a brief

22  sidebar.

23          THE COURT:  Yes.

24          (Continued on the next page.)

25

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

Sidebar

1      (The following occurred at sidebar.)

2      MS. ARGO:  Your Honor, it seems like this witness,

3  just knowing her, she seems to be just getting tired and not

4  answering the question because she's just really tired --

5      THE COURT:  She's pooped.

6      MS. ARGO:  -- and exhausted.

7      THE COURT:  We'll break for the day.

8      MS. ARGO:  I don't think she's trying deliberately to

9  avoid your question.  I think my sense is she's having like

10  just -- she's just disconnecting.

11      THE COURT:  You want me to close it down for the day?

12      MS. ARGO:  I think it might make sense honestly just

13  to start fresh tomorrow.

14      THE COURT:  Okay.

15      MR. GOLD:  I mean, obviously I don't agree with that

16  characterization, but if that's what the Court feels is best.

17      THE COURT:  Well, she does seem to be sort of

18  abstracting herself from questions that are being asked.

19      MR. GOLD:  She's certainly not answering them, I'll

20  grant you that.

21      THE COURT:  Yes, she's not.  I'm only getting

22  concerned that the longer the trial goes the greater the

23  likelihood it will end without ending, so...

24      MS. ARGO:  Should we maybe take a break, a 10-minute

25  break.

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

Delia – Cross/Gold

1           THE COURT:  We can take a break, we can start earlier

2     tomorrow --

3           MR. GOLD:  Whatever you want.

4           MS. ARGO:  What do you want?

5           MS. HAJJAR:  Take a break.

6           THE COURT:  Ten-minute break.

7           We'll do a 10-minute break right now.

8           (End of sidebar conference.)

9           (Continued on the next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

Delia – Cross/Gold

1              (In open court.)

2              THE COURT:  We're going to have a 10-minute break.

3              THE COURTROOM DEPUTY:  All rise.

4              (Jury exits courtroom.)

5              THE COURT:  We're just going to take a break.

6              (Recess.)

7              (In open court; jury not present.)

8              THE COURT:  Are you feeling all right?

9              THE WITNESS:  Yes, I feel much better.  Thank you.

10             THE COURT:  Is everybody here?

11             MR. GOLD:  Yes, Your Honor.

12             THE COURTROOM DEPUTY:  All rise.

13             (Jury enters courtroom.)

14             THE COURT:  Please be seated.  Mr. Gold.

15             MR. GOLD:  Thank you, Your Honor.

16   BY MR. GOLD:

17   Q    Before the break I asked you if these were your

18   photographs and if you had turned them over to the government

19   and you indicated you didn't remember.

20             Do you recall that question and that answer?

21   A    Yes, that's right.  I turned over the things without

22   knowing what photographs were in there.

23   Q    So you never saw any of the photographs I've shown you?

24   A    Some photos I took but it's been a long time since I have

25   seen them.

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

910

Delia - Cross/Gold

1    Q    And these photos were on either your computer or your

2    phone or your camera, correct?

3    A    Correct.

4    Q    And it's your testimony that you never looked at them

5    before you gave it to the government?

6    A    I don't remember if I did.

7    Q    And do you remember ever going over these photographs with

8    the government?

9    A    Can you repeat the question, please.

10   Q    Do you remember reviewing any of these photographs with

11   the government prior to your testimony today?

12   A    No, some photos I didn't.

13   Q    I'm sorry, I didn't --

14   A    No, some photos I didn't.

15   Q    I'm asking you about the photos that I have just shown you

16   before we took a break, had you ever gone over any of them with

17   the government?

18   A    Yes.

19   Q    And it's your testimony that in none of those photographs

20   I showed you were you having fun?

21   A    That's right.

22   Q    I show you what's marked Exhibit 3 dated March 17th, 2013.

23              THE LAW CLERK:  Mr. Gold to everyone?

24              MS. ARGO:  Yes.

25

---

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

Delia – Cross/Gold

1    BY MR. GOLD:

2    Q    Can you see what's marked as Defense Exhibit 3?

3    A    Yes.

4    Q    You took that picture, correct?

5    A    I don't remember if I did.

6    Q    Well, it's in your bedroom, isn't it?

7    A    There are some things in there that I don't recognize.

8    Q    How about the bear on the wall?

9    A    I don't remember it.

10   Q    You haven't seen that bear in other photos that Ms. Argo

11   showed you this morning?

12   A    Right now I don't remember it.

13   Q    How about the hats on the wall, do you remember that?

14   A    I don't remember that.

15   Q    You do remember the man in the photograph, right?

16   A    Yes.

17   Q    That's Francisco, correct?

18   A    That's correct.

19   Q    And you don't remember if this is your bedroom?

20   A    The things that are there I don't recognize.

21   Q    Regardless of where this photo was taken, did Francisco

22   ever force you to take a photograph of him?

23   A    Well, Francisco would ask me to take pictures of him.

24   Q    And you did?

25   A    That's right.

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

Delia – Cross/Gold

1  Q    I show you what's marked as Defense Exhibit 4.  Do you

2  recognize when this picture was taken?

3  A    No, I don't know when that photo was taken.

4  Q    Well, it was taken September 3rd, 2013.  Does that refresh

5  your recollection as to whose party it was?

6  A    No, I don't remember.

7  Q    Okay.  Is that a picture of you all the way on the left

8  with your arm -- with Francisco's arm around you and presumably

9  yours around him?

10 A    Can you repeat the question once more please.

11 Q    Starting from the left of the photograph, from your left,

12 can you identify the individuals in the photo?

13 A    Yes.  There's me, Francisco, Rosalio and Fabiola.

14 Q    I think you left someone out.

15 A    I don't remember the child's name.

16 Q    Was it his birthday?

17 A    I don't remember that.

18 Q    In this photograph are you smiling?

19 A    Yes.

20 Q    Were you happy in this photograph?

21 A    I don't know that.

22 Q    I show you what's marked as Defense Exhibit 5A.  I ask you

23 if you recognize this photo and when it was taken?

24 A    Well, I recognize myself but I don't know when it was

25 taken.

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

Delia - Cross/Gold

1    Q    Do you recognize anyone else in the photo?

2    A    Yes, Francisco is in that picture.

3    Q    And this was taken on January 1st, 2013, does that refresh

4    your recollection?

5    A    I don't remember it.

6    Q    Do you know where this photo was taken?

7    A    No.

8    Q    Were you happy in this photo?

9    A    I don't know that.

10   Q    Anyone force you to be there on New Year's Day?

11   A    I don't remember.

12   Q    I show you what's marked as 5C.  Do you recognize that

13   photograph?

14   A    Yes.

15   Q    When was that taken?

16   A    I don't know.

17   Q    Does January 1st, 2013 refresh your recollection?

18   A    I don't remember when the photo was taken.

19   Q    Were you happy in this photograph?

20   A    I don't know.

21   Q    I'm sorry?

22   A    I don't know.

23   Q    It doesn't look like you were laughing with Francisco in

24   this photograph?

25   A    I don't know.

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

Delia – Cross/Gold

1   Q     You don't remember making fun of him because he was so

2   cold?

3   A     I don't remember that.

4   Q     Just a few more.  I show you marked as 6A in evidence, do

5   you remember this photograph?

6   A     No.

7   Q     This wasn't taken at one of your birthday parties?

8   A     Yes.  That's what it looks like.

9   Q     You were shown similar pictures this morning by Ms. Argo

10  with cake on your face, do you recall that?

11  A     Yes.

12  Q     But you don't remember this one; is that right?

13  A     No.

14  Q     Were you happy in this photograph?

15  A     I don't know.

16  Q     Was Francisco happy?

17  A     I don't know.

18  Q     Finally, I show you 6B, as in boy.  Do you recall when

19  this was taken?

20  A     No.

21  Q     Do you recall if it was taken at your birthday party?

22  A     I don't know.

23  Q     Is it your testimony that in none of the photos that I

24  have shown you were you having fun?

25  A     I don't remember that.

Delia - Cross/Gold

1   Q    In fact, until you left, you and Francisco lived like

2   husband and wife, didn't you?

3   A    We never got married.

4   Q    Did you -- would you agree that you lived as boyfriend and

5   girlfriend?

6   A    Yes.

7   Q    You were a couple, correct?

8   A    Yes.

9   Q    And on occasions when either you sent money to Mexico or

10  he did, you believed -- you believed that the money was going

11  to be used to purchase a house or land for the two of you to

12  live, correct?

13  A    I don't remember that.

14  Q    Do you remember ever speaking with his father while you

15  were in Queens and his father was in Mexico in which his father

16  said some day when he dies you and Francisco will live in their

17  house?

18  A    I don't remember that.

19  Q    Do you remember asking Francisco to buy land for your

20  parents to live next to his parents' house?

21  A    I don't remember having said that.

22  Q    Now after years of living together, your relationship with

23  Francisco began to deteriorate at the end of 2013, would that

24  be fair to say?

25  A    I don't remember that.

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

Delia - Cross/Gold

1    Q    Do you remember a woman calling the apartment claiming to

2    be Francisco's wife?

3    A    Could you please ask me the same question using different

4    words.

5    Q    Sure.  Did a woman start calling the apartment claiming to

6    be Francisco's wife?

7    A    No.

8    Q    You didn't confront Francisco about this woman calling

9    claiming to be his wife?

10   A    I remember telling Francisco that I was getting calls on

11   my phone from a woman who said she was Francisco's domestic

12   partner, but I don't remember that she ever came to the

13   apartment.

14   Q    Perhaps I was confusing.  You've just answered the

15   question.

16          So a woman did call claiming to be -- called you

17   claiming to be Francisco's wife or significant partner?

18   A    That's correct.

19   Q    And you were angry, correct?

20   A    Yes.

21   Q    And you confronted him?

22   A    Yes.

23   Q    And he told you to ignore the calls, that she was just

24   trying to break you up, you and Francisco up, correct?

25   A    That's correct.

Sidebar

1    Q     And around the same time you overheard a conversation in

2    which Francisco said he was breaking up with you and sending

3    you back to your parents in Mexico, do you recall that?

4    A     I don't remember that.

5    Q     And the next day after you overheard this conversation,

6    you recall telling a friend that he was sending you back and

7    that you wanted to leave him, do you recall?

8    A     I don't remember that.

9    Q     And you do you recall arguing with Francisco about him --

10   withdrawn.

11          Do you recall that the day after having a conversation

12   with this friend, Francisco asked you --

13          THE COURT:  Mr. Gold, let's talk at sidebar.

14          (Continued on the next page.)

15

16

17

18

19

20

21

22

23

24

25

Delia – Cross/Gold

1          (The following occurred at sidebar.)

2          THE COURT:  She answered the first question that she

3   didn't recall ever having a conversation at all, then you asked

4   her four follow-up questions that after having the

5   conversation, don't do that.

6          MR. GOLD:  Okay.

7          MR. DUNN:  Your Honor, before we leave, I'm going to

8   be going next, I may take anywhere from 15 minutes to over half

9   an hour.

10          THE COURT:  We can do it tomorrow.

11          MR. DUNN:  Great thanks, Judge.

12          MR. GOLUB:  Yes.

13          (End of sidebar conference.)

14          (Continued on the next page.)

15

16

17

18

19

20

21

22

23

24

25

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

Delia – Cross/Gold

1              (In open court.)

2              MR. GOLD:  Okay?

3              THE WITNESS:  Yes.

4              THE COURT:  Are you ready?

5              MR. GOLD:  Yes, Your Honor.

6              THE COURT:  Go ahead.

7     BY MR. GOLD:

8     Q    During any argument with Francisco a few months before you

9     left, did you ever hit him?

10    A    I don't remember.

11    Q    In any event, it became apparent that your dream of living

12    a life with Francisco was not going to happen?

13    A    That's correct.

14    Q    And did you know -- withdrawn.  Did you ever know of an

15    individual by the name of Carla?

16    A    I don't remember that.

17    Q    Do you remember ever being in a car with a delivery and

18    other prostitutes in which there was a conversation about

19    somebody who was a prostitute and went to the police and turned

20    in her pimp.  Do you recall a conversation to that effect?

21    A    I don't remember that.

22              (Continued on the next page.)

23

24

25

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

Delia – Cross/Gold

1          (In open court.)

2     CROSS-EXAMINATION

3     BY MR. GOLD (continuing):

4     Q     Do you remember any conversation in which you learned that

5     a prostitute had claimed to be a victim and therefore was able

6     to obtain legal status in the United States upon making that

7     complaint?

8     A     I don't remember that.

9     Q     You don't remember ever telling the agents that?

10    A     So much time has gone by I don't remember.

11    Q     And you don't remember any prostitute by the name of

12    Carla?

13    A     I don't remember.

14    Q     Now, finally, in April -- oh, I don't want to build up

15    false hopes.  I shouldn't have used the word "finally."

16          In April of 2014, right after you left, you received a

17    text from Francisco, didn't you?

18    A     I don't remember that.

19    Q     You don't remember telling the agents that 15 minutes

20    after you left Francisco texted you, asking you, quote, did you

21    take the keys, love, why are you leaving?

22    A     So much time has gone by I don't remember.

23    Q     But do you recall receiving a text from him, or no?

24    A     I don't remember that right now.

25    Q     Now, after you left you got a new telephone, correct, or a

MICHELE NARDONE, CSR -- Official Court Reporter

Delia - Cross/Gold

1   new number?

2   A    I got a new phone number.

3   Q    With that new phone number you called Francisco, didn't

4   you?

5   A    I don't remember.

6   Q    Do you recall telling Francisco when you called him that

7   unless he sent money to your father you were going to the

8   police within 14 days?

9   A    I don't remember.

10  Q    Do you recall him asking you why you took --

11              MS. ARGO:  Objection.

12              THE COURT:  The same problem.

13              MR. GOLD:  I'm asking if she recalls him asking,

14  something entirely different.

15              MS. ARGO:  We can have a sidebar.

16              THE COURT:  She said she didn't recall that telephone

17  conversation ever took place.

18              MR. GOLD:  I'm asking about another event.  Okay.

19              THE COURT:  Is it a different phone conversation?

20              MS. ARGO:  The issue is, Your Honor, the statements

21  that are being elicited from the defendant.

22              THE COURT:  I'm sorry?

23              MS. ARGO:  Defendant's own statements are being

24  elicited through the questions, Your Honor.

25              THE COURT:  That's for sure.  Hearsay.

MICHELE NARDONE, CSR -- Official Court Reporter

Delia - Cross/Gold

1    BY MR. GOLD:

2    Q    Did you take Francisco's sneakers when you left the

3    apartment?

4    A    Of course I did, because I was the one who had bought them

5    for him with the money I was making.

6    Q    When you left you took approximately how much money?

7    A    I don't remember.

8    Q    Do you recall telling agents that you took $700?

9    A    I don't remember that right now.  So much time has gone

10   by.

11   Q    You took your computer, correct?

12   A    Yes.

13   Q    You took the records of the drivers, that you went over

14   with Ms. Argo this morning, correct?

15   A    That's correct.

16   Q    When you left the apartment was it your intention to go to

17   the police?

18   A    No.

19   Q    I'm sorry?

20   A    No.

21   Q    When you left the apartment was it your intention to

22   continue to be a prostitute?

23   A    No.

24   Q    But of the few things you took with you, one of them was a

25   record of all the drivers, correct?

Delia – Cross/Gold

1    A     Yes.  I didn't want to do that anymore.  I never did it

2    again after I escaped.

3    Q     After you went to the police, they took you to the

4    hospital, correct?

5    A     Yes.

6    Q     You were examined by doctors and nurses at the -- it was

7    Bellevue Hospital, correct?

8    A     I don't remember the name of the hospital.

9    Q     Okay, but whatever hospital it was, you were examined by

10   some doctors and nurses, correct?

11   A     Yes.

12   Q     And they asked you what your physical condition was,

13   correct?

14   A     I don't remember that.

15   Q     Do you remember ever complaining to them about your mouth?

16   A     I don't remember that.

17   Q     By the way, in any photograph I showed you did you see any

18   sign of any injury on your person?

19   A     I don't know.

20   Q     Did you see anything?

21   A     No.  I don't know what you mean by that.  Could you repeat

22   your question using different words?

23   Q     Sure.  I showed you a bunch of photographs, correct?

24   A     Yes.

25   Q     Were you in a lot of those photographs, if not all of

Delia – Cross/Gold

1    them?

2    A    Well, I know I'm in them.

3    Q    My question is:  In any photograph that I showed you did

4    you see any marks or bruises on you?

5    A    No.

6    Q    After you went to the police you also wound up meeting a

7    few days later with agents of Homeland Security; do you recall

8    that?

9    A    I did meet, yes.

10   Q    And I don't recall whether you said it was the police or

11   Homeland Security, but they arranged to get you housing; is

12   that right?

13   A    That's correct.

14   Q    And they arranged for you to get an attorney?

15   A    I don't remember that.

16   Q    Well, 11 days after you went to the police did you file an

17   application for a T visa?

18   A    Yes.

19   Q    Did you have a lawyer?

20   A    Yes.

21   Q    How did you get that lawyer?

22   A    I don't remember that.

23   Q    Okay.

24   A    I don't remember.  I just remember there came a time where

25   I had a lawyer.

MICHELE NARDONE, CSR –– Official Court Reporter

Delia - Cross/Gold

1   Q     When this visa application was filed, you were asking for

2   legal status here because you were a minor victim of sex

3   trafficking, correct?

4   A     Can you ask me your question using other words, please?

5   Q     Sure.  Did you understand that the application for a T

6   visa would grant you legal status in America, if it was

7   granted?

8   A     At that time I didn't know what a T visa was.

9   Q     You filed an application with an accompanying affidavit

10  claiming to be a victim of sex trafficking, didn't you?

11  A     I am a victim of sex trafficking.

12  Q     Thank you.  My question is:  Did you file for legal status

13  in the United States on the basis of you being a minor victim

14  of sex trafficking?

15  A     Yes.

16  Q     In that application you claim that Francisco was your pimp

17  and forced you to be a prostitute, correct?

18  A     That's correct.

19  Q     Now, during the time you lived with Francisco you had a

20  continuing argument with him about getting your personal

21  documents from him.

22        Do you recall testifying to that?

23  A     Yes.

24  Q     And as I recall, Ms. Argo asked you if you knew where your

25  birth certificate was, and you said Francisco had it.

MICHELE NARDONE, CSR -- Official Court Reporter

Delia - Cross/Gold

1    A    That's right.

2    Q    And 11 days after you left the apartment you filed this T

3    visa application, correct?

4    A    At that time I didn't know what a T visa was.

5    Q    Shortly after you went to the police, you and your lawyer

6    filed this application for legal status that we were talking

7    about earlier, correct?

8    A    Yes.

9    Q    And do you recall submitting as part of that application a

10   copy of your birth certificate?

11   A    That's correct.

12   Q    Where did you get it?

13   A    My mother had an exact copy.

14        THE INTERPRETER:  I'm sorry.  Interpreter correction.

15   "My mother had a copy of that certificate."

16   Q    So all these years you fought about these documents and

17   your mother was able to get a copy in 11 days?

18   A    My mother always kept copies of our documents, but she did

19   not have the original.

20   Q    If I just may ask:  Did your parents and Francisco's

21   parents ever celebrate Christmas together?

22   A    I don't remember that.

23   Q    Do you recall your mother being operated upon and taken to

24   the hospital by his parents?

25   A    I don't remember that.

MICHELE NARDONE, CSR -- Official Court Reporter

Sidebar

1    Q    Do you remember if your mother ever recuperated from any

2    operation in Francisco's parents' home?

3    A    I don't remember that.

4    Q    Did you ever pay taxes on the money you earned as a

5    prostitute?

6    A    I don't know what taxes are.

7    Q    How long have you been living here now?

8    A    At that time I didn't know what taxes were.

9    Q    Thank you for that.

10         My question is:  Have you ever paid taxes on the money

11   you earned as a prostitute?

12   A    No, because I didn't know what that is.

13   Q    Do you know what taxes are as you are sitting here now?

14   A    Yes.

15   Q    Okay.  Tomorrow are you going to pay taxes on the money

16   you earned as a prostitute?

17   A    What are you talking about with that question?  Can you

18   ask me that in a different way please?

19         THE COURT:  Yes.  Would you just move on.

20   Q    Did you ever file tax returns?

21   A    No.

22         MS. ARGO:  Your Honor.

23         THE COURT:  Mr. Gold, sidebar.

24         (Continued on the next page.)

25

MICHELE NARDONE, CSR -- Official Court Reporter

Delia – Cross/Gold

1          (Sidebar conference.)

2          THE COURT:  This may be effective with some witnesses.

3    It's just not with this one.  Can you move on?

4          I can't even -- I mean, I can't say she is required to

5    pay taxes under the circumstances.

6          MS. HAJJAR:  She was a minor.  Mr. Gold has gotten

7    into a lot of -- she was a minor.

8          MR. GOLD:  That's a fair point.

9          MS. ARGO:  How would she know to pay taxes as a

10   14-year-old?

11         MR. GOLD:  Hold on.  That's a fair point.

12         (End of sidebar conference.)

13         (Continued on the next page.)

14

15

16

17

18

19

20

21

22

23

24

25

MICHELE NARDONE, CSR -- Official Court Reporter

USA v. Melendez-Rojas, et al.

1           (In open court.)

2   BY MR. GOLD:

3   Q    You have relocated to another state, correct?

4   A    That's correct.

5   Q    Did the government help you relocate in any way?

6   A    No.

7   Q    You are changing your name legally, correct?

8   A    Yes, because I'm scared.

9   Q    At any time, either before or after you went to the

10  police, have you or any member of your family been harmed by

11  Francisco?

12  A    I don't know that.

13  Q    You don't know if your family was harmed?

14  A    No.

15  Q    Do you know if you were harmed?

16  A    No.

17          MR. GOLD:  Nothing further, Your Honor.

18          THE COURT:  Okay.  I think it's a good time to stop,

19  ladies and gentlemen.  I'm sorry it went so late.

20          Would you be back in the jury room at 9:30, and

21  hopefully we will move through quickly.  Leave all of your

22  things in the jury room, and don't talk about the case.

23          THE CLERK:  All rise.

24          (Jury exits.)

25          (Continued on the next page.)

MICHELE NARDONE, CSR -- Official Court Reporter

USA v. Melendez-Rojas, et al.

1          MS. HAJJAR:  Your Honor, may we put one thing on the

2    record?

3          THE COURT:  Yes.

4          MR. GOLD:  Erin, the witness is still here.

5          MS. ARGO:  Sorry.

6          (Witness exits courtroom.)

7          MS. HAJJAR:  The government informed Mr. Gold of this,

8    but I just wanted to put it on the record.

9          Earlier today it came to the government's attention

10   that an individual, a non-testifying individual, at one point

11   identified a photograph of Delia as a girl who worked in

12   prostitution in Mexico City.  There is no additional

13   information in this report that I was reviewing, but the time

14   frame that the witness identified this photograph was in was in

15   2004, when Delia would have been approximately nine years old.

16         It's the government's view this identification must

17   have been an error.  However, we wanted -- we have let Mr. Gold

18   know, and we will tell other counsel prior to their

19   cross-examination, in the event they wish to inquire.  That

20   identification wasn't known to the government until today, or

21   we hadn't --

22         THE COURT:  When she was nine years old, and you don't

23   know the name of the person?

24         MS. HAJJAR:  The witness did not identify the person,

25   did not know the person's name; but when shown a photograph

MICHELE NARDONE, CSR -- Official Court Reporter

USA v. Melendez-Rojas, et al.

1   from a victim photo book, among many identifications, she said

2   apparently that may be someone that worked as a prostitute in

3   Mexico City; but, in the government's view, that does not make

4   any sense given the time frame the witness had.

5          MS. ARGO:  The testimony of not just this witness but

6   other witnesses as well.

7          THE COURT:  I'm sorry?

8          MS. ARGO:  With regard to also the testimony that's

9   been provided here at trial, not just by this witness but other

10  witnesses as well, that doesn't make sense.

11         THE COURT:  Oh, okay.

12         MR. GOLD:  Your Honor?

13         THE COURT:  I don't think that's anything anyone is

14  going to want to pursue.

15         MR. GOLD:  No.  I was informed of this immediately

16  prior to my cross-examination, and I told the government I had

17  no intention and needn't pursue this at all; but they did say

18  that, and I was notified.

19         The other -- are you finished?

20         MS. HAJJAR:  Yes.

21         MR. GOLD:  We had spoken relative to the photographs

22  that I was showing the witness.

23         THE COURT:  Yes.

24         MR. GOLD:  And her not remembering whether or not she

25  gave them to the government, and then finally when she did give

USA v. Melendez-Rojas, et al.

1    something to the government but doesn't know which actually.

2         THE COURT:  No.  She actually eventually indicated she

3    gave photographs to the government, and at least some of the

4    photographs she gave were the photographs that you showed her.

5         MR. GOLD:  I don't believe so, Your Honor.  I think

6    what she said was she didn't look at the photographs.  She

7    didn't look at what she gave the government.

8         MS. ARGO:  I believe her testimony was that she

9    recalled providing the photographs that were on her computer

10   and phone and various places.

11        MR. GOLD:  Correct.

12        MS. ARGO:  But she wasn't certain --

13        THE COURT:  Which photographs.

14        MS. ARGO:  And had not actually examined all those

15   photographs prior to providing them to the police at the time,

16   I think.

17        MR. GOLD:  Exactly.  I'm not starting an argument.

18        It's simply I think the government is willing to

19   stipulate that these photographs were provided by her to them

20   and the dates that I was referring to -- I mean, we don't have

21   to say that, but I would tell the court that the dates I kept

22   referring to relative to each of the photographs, it came right

23   from the memory disk that it was contained on.

24        MS. ARGO:  I will just say this.  The memory card or

25   those, I don't know that that's accurate.  I can't swear that

MICHELE NARDONE, CSR -- Official Court Reporter

USA v. Melendez-Rojas, et al.

1   whatever is on that memory card is accurate.

2          MR. GOLD:  Well, those are the dates that are on the

3   line from when the picture was taken.  It gives a date, and

4   each of those dates is what I used when confronting the

5   witness.  So I wasn't pulling these dates out of thin air.

6   This is what's on the card.

7          MS. ARGO:  I'm not disputing they were on the disk

8   itself.  I'm not disputing that.  I'm just saying --

9          THE COURT:  Yes, you don't know they are accurate.

10         MS. ARGO:  I don't know they are accurate.

11         THE COURT:  But she is agreeing they were on the disk.

12         MR. GOLD:  I don't want the jury to believe I'm making

13  up dates or making up photos.  Whatever language they want to

14  use that will convey that, yes, these are the dates that are

15  associated with the specific photographs on the disk that was

16  provided, and I think that's an accurate.

17         MS. HAJJAR:  I'm sorry.  Mr. Gold has done exactly

18  what's permissible, which is he had a good-faith basis to ask

19  the date of the question, which he did.  The witness said I

20  don't remember.

21         It's clear, based on the content of the photographs

22  and who was in them, what time frame we are talking about.

23         MR. GOLD:  Fine.  I will put in the Sandisk and let

24  it -- if you want me to do that, I will do that.  I'm trying to

25  speed things along, but if I have to stand here and call her

MICHELE NARDONE, CSR -- Official Court Reporter

USA v. Melendez-Rojas, et al.

1  back and show her the Sandisk, is this what she provided the

2  government, and put it in as evidence, I will do it that way.

3  All I want is no dispute as to the dates I was using.  That's

4  all.

5          MS. ARGO:  I guess I'm just not sure what the purpose

6  of that is, to have the witness or the government stipulate to

7  something that it doesn't actually know for certain is correct,

8  these dates that are on this desk.

9          THE COURT:  Are you going to be arguing anything about

10  the dates, if that argument was made by Mr. Gold in his

11  summation?

12          MS. HAJJAR:  No.

13          MS. ARGO:  No.

14          MR. GOLD:  I am going to be arguing.

15          THE COURT:  That's fine.  They are not going to

16  dispute that.  No, they won't dispute it.  So you are okay?

17          MR. GOLD:  That's fine.  Then I'm happy.  See how

18  easy.

19          MS. KELLMAN:  Your Honor, can we get the order of

20  witnesses?

21          THE COURT:  Yes.  Well, I guess we have final

22  cross-examination by Mr. Dunn and Mr. Hueston.

23          Mr. Dunn, you said you would be 15 to 30 minutes?

24          MR. DUNN:  I believe so, yes, Your Honor.

25          THE COURT:  Mr. Hueston?

MICHELE NARDONE, CSR -- Official Court Reporter

USA v. Melendez-Rojas, et al.

1              MR. HUESTON:  Five minutes, maybe ten.

2              MR GOLUB:  I have a few questions as well.

3              THE COURT:  And you have a few?

4              MR. GOLD:  And I will have another hour or two.

5              THE COURT:  You know how to make a joke.  Okay.

6              So that's under an hour.  I don't know whether there

7    is going to be any redirect.  If there is, that's fine.

8              MS. ARGO:  Thank you.

9              THE COURT:  After that?

10             MS. KASSNER:  Magdalena Martinez, she is the wire

11   transfer analyst.

12             THE COURT:  The wire transfer lady, and after that?

13             MS. HAJJAR:  I think there is going to be -- I don't

14   know the precise order, but it will be Special Agent

15   Christopher Davis of Homeland Security Investigations, Jim

16   O'Dell from Customs and Border Patrol, and then there may be a

17   couple more CBP witnesses.  There are two additional victim

18   witnesses who will be testifying.

19             THE COURT:  Will you get to the victim witnesses

20   tomorrow?

21             MS. HAJJAR:  If we did, it would be very late in the

22   day, and it would be Diana.

23             THE COURT:  So your plan is to get to all witnesses

24   except the last two victims, if you can do it.

25             MS. HAJJAR:  If we can, yeah.

MICHELE NARDONE, CSR -- Official Court Reporter

USA v. Melendez-Rojas, et al.

1          MS. ARGO:  It may be that we have one or two, just

2    based on availability, that may need to be on Wednesday, but

3    they should be brief.

4          THE COURT:  If there are any additional witnesses

5    other than the last two victims.

6          MS. ARGO:  Correct, Your Honor.  Any additional sort

7    of custodian witnesses.

8          THE COURT:  So after all these people, do you know,

9    one is Diana and the other is --

10         MS. HAJJAR:  Is Veronica.

11         THE COURT:  Is Veronica?

12         MS. HAJJAR:  Yes.

13         THE COURT:  Do you know which comes first and which

14   will go second?

15         MS. HAJJAR:  We think Diana will come first.  Again,

16   it's according to scheduling.  If there are child care issues,

17   we will do it out of order.

18         MS. KELLMAN:  It will affect my ability to

19   cross-examine because I have both of them, which is why I would

20   like to know what the order is; and I have been asking since

21   the trial started.

22         MS. KASSNER:  Your Honor, I need to speak with one of

23   the witnesses tonight.  We need to check on child care.  So we

24   can't say at this moment.

25         THE COURT:  I'm sorry.  I can't hear.

MICHELE NARDONE, CSR -- Official Court Reporter

USA v. Melendez-Rojas, et al.

1    MS. KASSNER:  I need to speak with them about child

2    care tonight, but once we have information and have --

3    THE COURT:  Will you just call or e-mail Ms. Kellman

4    when you get that information?

5    MS. KASSNER:  Yes, Your Honor.

6    MS. KELLMAN:  Because I'm happy to take the weekend to

7    prepare.

8    THE COURT:  No.  We do want to finish this this week.

9    That will be the end of the government's case?

10    MS. HAJJAR:  Yes.

11    MS. ARGO:  So the question is, though, Your Honor, for

12    scheduling purposes, we would have a rebuttal case if there is

13    going to be a defense case.

14    THE COURT:  Are any of the defendants planning at this

15    point to put on some sort of case?

16    MS. KELLMAN:  Hard to say.

17    MR. GOLD:  No.

18    THE COURT:  Mr. Dunn says no?

19    MR. DUNN:  I have no comment, Your Honor.  I don't

20    know.

21    THE COURT:  Mr. Golub, you said no?

22    MS. KELLMAN:  I haven't said anything, judge.

23    THE COURT:  Who said no?  Oh, Mr. Gold said no.

24    MR. GOLD:  I will withdraw it, judge.

25    THE COURT:  Come on.  You know, if you really don't

MICHELE NARDONE, CSR -- Official Court Reporter

USA v. Melendez-Rojas, et al.

1  know, that's fine.  But you can have -- if there is any

2  likelihood, I'm really concerned about this getting over before

3  we can't come back.

4          MS. KELLMAN:  You don't think we can do it by audio?

5          MR. GOLD:  Your Honor, two things, seriously.

6          THE COURT:  I don't think you want to come back

7  either.

8          MS. KELLMAN:  No.

9          MR. GOLD:  Seriously, when I say no, subject, of

10  course, to my client, who can decide to testify.

11          THE COURT:  Of course.

12          MR. GOLD:  Other than that is what I'm saying no to.

13          THE COURT:  Okay.

14          MS. KELLMAN:  I have a question, judge.  Is there any

15  chance we are not working Friday?

16          THE COURT:  No.  Because if we can get through Friday

17  and get it over with, we have saved ourselves perhaps.

18          MS. KELLMAN:  I assumed that was the response.

19          THE COURT:  We are in unusual circumstances.

20          MS. KELLMAN:  I have a grand jury appearance in D.C.

21          THE COURT:  I'm so sorry.

22          MR. GOLD:  So we will be moving right into summations

23  is what you are saying?

24          THE COURT:  If we can, I will.  I mean, it depends.

25  I'm not going to just make somebody, you know, sum up for 30

MICHELE NARDONE, CSR -- Official Court Reporter

USA v. Melendez-Rojas, et al.

1  minutes and then go over to the next day.  But, depending upon

2  the timing, I would love to get through summations and charge

3  this week.  I don't know.

4        I don't know if you are putting cases on.  I don't

5  know if, therefore, the government is putting on a rebuttal.

6  If we can't do it, we won't do it.

7        MR. GOLD:  Understood.  Thank you.

8        THE COURT:  Okay.

9        MS. KELLMAN:  But I won't be at the grand jury.

10       THE COURT:  You won't be at the grand jury.  Sorry.

11       (Trial adjourned to Tuesday, March 10, 2020 at

12  9:30 a.m.)

13                        o O o

14

15  Certified to be a true and accurate transcript.
    /s/ Michele Nardone
16  MICHELE NARDONE, CSR -- Official Court Reporter

17

18

19

20

21

22

23

24

25

USA v. Melendez-Rojas, et al.

1                          I N D E X

2                          WITNESS

3

4           Delia – Direct/Argo                    780
            Delia – Cross/Gold                     867

5

6                          EXHIBITS

7           201                                     792
            202                                     795
8           884                                     802
            873                                     803
9           11                                      819
            13                                      820
10          16                                      821
            17                                      822
11          18                                      823
            19                                      823
12          20                                      824
            21                                      824
13          22                                      825
            23                                      826
14          45                                      839
            46                                      840
15          855                                     841
            856                                     842
16          857                                     842
            857A                                    844
17          858                                     845
            859                                     846
18          860                                     847
            861                                     847
19          862                                     848
            865 through 874C                        851
20          853                                     851
            863                                     863
21          Defense 1 and 2                         882

22

23                          o O o

24

25

MICHELE NARDONE, CSR –– Official Court Reporter